_____

No. 95-1754
_____

Honeywell, Inc.; Honeywell      *
Pension and Retirement          *
Committee, on their own behalf  *
and on behalf of the Honeywell  *
Retirement Investment Plan;     *
Investment Plus Plan of         *
Honeywell, Inc.; Honeywell      *
Retirement Savings Plan; First  *
Trust National Association,       *
                                  *
          Plaintiffs-Appellants,  *  Appeal from the United States
                                  *  District Court for the
     v.                           *  District of Minnesota.
                                  *
Minnesota Life and Health       *
Insurance Guaranty Association,   *
                                  *
          Defendant-Appellee.     *


_____

          Submitted:  November 16, 1995

             Filed:  June 10, 1996
_____

Before HANSEN, JOHN R. GIBSON, and MURPHY, Circuit Judges.
_____


HANSEN, Circuit Judge.

     The plaintiffs (collectively referred to as Honeywell) appeal the
district court's[1] grant of summary judgment for the defendant, Minnesota
Life and Health Insurance Guaranty Association (the Association), in this
declaratory judgment suit.  At issue is whether an amendment to a Minnesota
statute, which amendment

_____

     [1]The Honorable Richard H. Kyle, United States District Judge
for the District of Minnesota.

applies retroactively, violates either the Contract Clause or the Due Process Clause of the Constitution of the United States. The district court granted the Association's motion for summary judgment and dismissed Honeywell's complaint, concluding that the amendment passes constitutional muster. We affirm.

## I. BACKGROUND

Honeywell, Inc. is a Delaware corporation with its principal place of business in Minnesota. Honeywell sponsors certain defined contribution benefit and retirement plans for its employees. These plans include the Honeywell Retirement Investment Plan, the Investment Plus Plan of Honeywell Inc., and the Honeywell Retirement Savings Plan. The current trustee of the Honeywell plans is First Trust National Association, which has its principal place of business in Minnesota.

The Association is a nonprofit Minnesota corporation created pursuant to the Minnesota Life and Health Insurance Guaranty Association Act (the Act), Minn. Stat. Ann. §§ 61B.01-61B.16 (West 1986).[2] The Association exists to protect the contractual rights of policy owners and beneficiaries of life insurance policies, health insurance policies, and annuity contracts (subject to certain definitions and limitations), when the insurer that issued the life insurance, health insurance, or annuity contract becomes financially unable to perform its obligations. See Minn Stat. Ann. § 61B.02, subd. 2. See also Minnesota Life & Health Ins. Guar. Assoc. v. Department of Commerce, 400 N.W.2d 769, 770 (Minn. Ct. App. 1987). To provide this protection, all insurance companies

_____

[2]This Act has been repealed and was replaced in 1993 with Minn. Stat. Ann. §§ 61B.18 - 61B.32 (West Supp. 1996). The legislature provided, however, that §§ 61B.01 - 61B.16, as amended in 1992, remain applicable to the subject of this suit. Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Assoc., 518 N.W.2d 557, 558 n.4 (Minn. 1994). The issue in this case deals with a 1992 amendment to the Act, and not the new 1993 version of the Act.

that deal in life, health, and annuity contracts and elect to do business in Minnesota are required to join and contribute to the Association. Minnesota Life, 400 N.W.2d at 770. The dispute in this case arose following the 1991 insolvency of an out-of-state member insurance company and the 1992 enactment by the Minnesota legislature of an amendment that retroactively redefines the term "contractual obligation" under the Act.

In 1988, the Honeywell plans' trustee, who was a Minnesota resident (as is the current trustee), invested in Guaranteed Investment Contracts (GICs) issued by Executive Life Insurance Company of California (ELIC), a member of the Association. GICs are unallocated annuity contracts, or annuity contracts "not issued to or owned by a named individual." Id. GICs are investments made by the trustee for the benefit of the plan participants and are considered covered policies under the Act. See id. at 775 (holding that GICs are covered annuities under Minn. Stat. § 61B.03, subd. 3 (1984)). The Honeywell GICs expressly name the Honeywell trustee as the policy owner, and not the individual plan participants for whom the investment was made. Honeywell, 518 N.W.2d at 561.

In 1991, ELIC became insolvent and unable to fulfill its contractual obligations on the Honeywell GICs, which amounted to $111,000,000. By letter dated January 10, 1992, the Honeywell trustee, as the resident policy owner, submitted to the Association a claim for guaranty coverage under the Act. Honeywell sought coverage for ELIC's entire obligation to the Honeywell trustee, which would inure not only to the benefit of Honeywell's 9,000 Minnesota resident plan participants but also to Honeywell's 27,000 nonresident plan participants.

The Association neither granted nor denied Honeywell's claim initially. ELIC's insolvency had also affected approximately 10,000 other Minnesota residents who were employed in Minnesota by other companies whose plan trustees owned GICs but which trustees

3

were <u>not</u> Minnesota residents. At that time, the Act required the Association to guarantee the covered policies of "residents" to whom any "contractual obligation" was owed from an out-of-state insurer. Minn. Stat. Ann. § 61B.06, subd. 2 (West 1986). <u>See</u> <u>Honeywell</u>, 518 N.W.2d at 558. The term "resident," defined as "any person who resides in this state at the time the impairment is determined and to whom contractual obligations are owed," Minn. Stat. Ann. § 61B.03, subd. 13 (West 1986), was broad enough to include a trustee who resided in Minnesota. <u>Honeywell</u>, 518 N.W.2d at 560-61. The term "contractual obligation," defined as "any obligation under covered policies," Minn. Stat. Ann. § 61B.03, subd. 5 (West 1986), was broad enough to include a GIC obligation owed to a resident trustee. <u>Honeywell</u>, 518 N.W.2d at 560-61. Thus, as then codified, the Act, combined with ELIC's insolvency, created the potential that all the Honeywell plan participants, thousands of whom were not residents of Minnesota, might be entitled to coverage under the Minnesota Act because their plan trustee happened to be a Minnesota resident. Whereas, many other Minnesota non-Honeywell employed resident plan participants, who worked for companies whose plan trustee resided in a different state, might not be entitled to any coverage because their trustee (the one to whom the contractual obligation was owed) was not a Minnesota resident.

Faced with this dilemma, on January 21, 1992, the Minnesota Department of Commerce (which supervises and regulates the Association and to whom appeals may be taken from the Association's determinations, <u>see</u> Minn. Stat. Ann. § 61B.09(c)), issued an opinion, advising the Association chairman on the coverage problems created by the ELIC insolvency:

> The Department believes it is the clear intent of the Act to cover the people of Minnesota. Accordingly, it is the Department's position that the Guaranty Association Act provides coverage to Minnesota resident employees who are the beneficiaries of defined-

4

contribution pension plans funded by Guaranteed Investment Contracts purchased from Executive Life.

Consistent with that position the Department has determined that non-resident employees of such a plan, regardless of the residency of the trustee or plan sponsor, are not covered under the Act.

(Appellee's App. at GA-59.)

Subsequently, on April 27, 1992, the governor signed into law an amendment to the definition of the term "contractual obligation," in a purported attempt to retroactively "clarify" the statutory coverage in a manner consistent with the Department of Commerce opinion. Honeywell, 518 N.W.2d at 562. The 1992 amendment, which specifically applies retroactively, narrowed the definition of "contractual obligation" to specifically exclude any obligation owed "to nonresident participants of a covered plan or to the plan sponsor, employer, trustee, or other party who owns the contract; in such cases, the association is obligated under this chapter only to participants in a covered plan who are residents of the state of Minnesota on the date of impairment." 1992 Minn. Laws, ch. 540. Thus, the amendment expressly provides coverage only to plan participants who are Minnesota residents. In light of the opinion of the Department of Commerce and the retroactive 1992 amendment, the Association took the position that its guaranty obligation to Honeywell covers only those Honeywell plan participants who resided in Minnesota when ELIC became insolvent.

Honeywell then brought an action for declaratory and injunctive relief and monetary damages in Minnesota state court based on the Association's refusal to fully guaranty the whole of the trustee's claim. Honeywell sought a declaration that retroactive application of the 1992 amendment violates both the Contract Clause and the Due Process Clause of the Constitution because Honeywell's entitlement to coverage and payment under the prior statute had fully accrued before the enactment of the 1992

5

amendment. The Association removed the case to federal district court pursuant to 28 U.S.C. § 1441.

After removal, the parties filed cross motions for summary judgment. The district court ruled in favor of Honeywell, holding that the retroactive abrogation of Honeywell's guaranty coverage rights impermissibly destroyed vested rights in violation of both the Contract Clause and the Due Process Clause of the Constitution. After the Association moved for reconsideration, however, the district court vacated its initial opinion and certified two questions to the Supreme Court of Minnesota: (1) Did the 1992 amendment to the Act's definition of "contractual obligation" effect a substantive change in the Association's obligations or merely clarify existing obligations? (2) Is the annuity contract owner's (the trustee's) right to guaranty payment from the Association a purely statutory right or is it contractual in nature? The Supreme Court of Minnesota ruled on the certified questions, holding that (1) the 1992 amendment to the definition of "contractual obligation" substantively changed the Association's coverage obligations, and (2) the right to payment from the Association is a purely statutory right under state law. See Honeywell, 518 N.W.2d at 563.

After the Supreme Court of Minnesota responded to the certified questions, the parties again filed cross motions for summary judgment. This time, the district court granted the Association's motion for summary judgment, concluding that retroactive application of the 1992 amendment did not violate either the Contract Clause or the Due Process Clause, and dismissed Honeywell's complaint with prejudice. Honeywell appeals.

## II. DISCUSSION

Honeywell contends that its preamendment right to insurance guaranty coverage is contractual in nature and that retroactive

application of the amendment constitutes the impairment of its contractual rights in violation of the Contract Clause.  Honeywell also argues that the 1992 amendment arbitrarily and irrationally destroyed its accrued, vested right to guaranty coverage, in violation of the Due Process Clause.  We begin our analysis with the Contract Clause.

## A.  CONTRACT CLAUSE

The Constitution provides, "No State shall . . . pass any Law impairing the Obligation of Contracts . . . ."  U.S. CONST. art. I, § 10, cl. 1.  Read literally, this constitutional prohibition bans any interference with contracts, but cases interpreting the clause clearly indicate that this prohibition "is not an absolute one and is not to be read with literal exactness like a mathematical formula."  Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934).  Instead, when a litigant contends that a legislative amendment has impermissibly impaired contractual obligations, our inquiry initially focuses on "whether the change in state law has `operated as a substantial impairment of a contractual relationship.'"  General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978)) (other citation omitted).  Three basic components are essential to this inquiry:  (1) Does a contractual relationship exist, (2) does the change in the law impair that contractual relationship, and if so, (3) is the impairment substantial?  Id.  If we conclude that a substantial impairment of a contractual relationship exists, we must then carefully examine "the nature and purpose of the state legislation."  Allied Structural Steel Co., 438 U.S. at 244.

We first consider whether a contractual relationship exists.  In this case, the district court certified to the state supreme court the question of whether the Association's guaranty obligation to GIC owners, such as the Honeywell trustee, is a contractual or

7

a statutory obligation.  The Supreme Court of Minnesota determined that the right to payment from the Association is a purely statutory right under state law.  Honeywell, 518 N.W.2d at 563.  Honeywell first contends that the district court erroneously certified a question of federal constitutional law to the state court.

While federal courts "accord respectful consideration and great weight to the views of the State's highest court," the determination of whether the Act created a contractual obligation "is a federal question for purposes of Contract Clause analysis, and whether it turns on issues of general or purely local law, we can not surrender the duty to exercise our own judgment."  Romein, 503 U.S. at 187 (internal quotations omitted). Contrary to Honeywell's assertion, however, the district court did not avoid its duty to determine the constitutional issue by certifying a question to the state supreme court.  Instead, the district court gave proper consideration to the state court's views but independently determined that the right to payment under the Act is not contractual within the meaning of the Contract Clause.  We review de novo the district court's judgment on this constitutional question.  See United States v. Bates, 77 F.3d 1101, 1104 (8th Cir. 1996).

Our independent review leads us to agree with the district court that the rights at issue are statutory in nature and therefore, no contractual relationship existed between Honeywell and the Association.  Two factors lead us to this conclusion:  (1) the Act itself does not create a contract, and (2) the GICs do not specifically incorporate the terms of the Act.

First, the Act's guaranty is not itself a contract between the Association and those who qualify for the Act's protection.  "In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create

8

private rights of a contractual nature enforceable against the State." United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n.14 (1977). The right to payment under the Act is not enforceable against the state of Minnesota but is an obligation imposed upon the Association. The Association is a nonprofit legal entity and not a state agency. Minn. Stat. Ann. § 61B.04, subd. 1 (West 1986). See also Minn. Stat. Ann. § 61B.21, subd. 1 (West Supp. 1996). Even if the Association were a state agency, the Act contains no "clear indication that the legislature intends to bind itself contractually," which is necessary in order to overcome the general presumption "that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry., 470 U.S. 451, 465-66 (1985) (quotations omitted). Rather, the Act creates an insurance guaranty association with attendant statutory obligations to safeguard the financial well-being of Minnesota residents to whom contractual obligations are owed by its member insurance companies. The Act does not create a contract; instead, it creates a statutory safety net to protect the economic well-being of Minnesota resident policy owners in the event a member insurer becomes insolvent.

Second, while the Association has the power to enter into contracts, Minn. Stat. Ann. § 61B.06, subd. 9(a) (West 1986), the Association is not a party to the GICs involved here. The GICs at issue are contracts between the Honeywell trustee and the impaired ELIC, not the Association. The Honeywell trustee did not specifically bargain for protection under the Act, and the Act is not expressly or impliedly incorporated into the terms of the GICs. "For the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts." Romein, 503 U.S. at 189. The Association's statutory obligation to guaranty the insurance coverage of residents protected by the Act

9

does not in any way affect the validity, construction, or enforcement of ELIC's obligation on the GICs. Moreover, there is no evidence that the GICs were created in pursuance of the statutory obligation. Cf. Coombes v. Getz, 285 U.S. 434, 442, 448 (1932) (upholding the contractual liability created pursuant to a state constitutional rule of law that was repealed). The 1992 amendment merely altered definitions under the Act, which in turn affect the Association's statutory obligation to the Honeywell trustee, but the amendment did not alter or affect any bargained-for agreement between the Association and the Honeywell trustee. The Contract Clause does not "protect against all changes in legislation, regardless of the effect of those changes on bargained-for agreements." Romein, 503 U.S. at 190.

We conclude that the Association's obligations are statutory in nature rather than contractual. Absent the existence of a contractual relationship, our Contract Clause inquiry is finished. The 1992 amendment simply does not implicate the Contract Clause.

## B. DUE PROCESS

Honeywell's due process claim presents a closer question. Honeywell argues that retroactive application of the 1992 amendment defeats its vested right to payment under the Act, in violation of the Due Process Clause. Honeywell relies on Coombes, 285 U.S. at 439-48, where the Supreme Court held unconstitutional the repeal of a California state constitutional provision that provided a cause of action against corporate directors. The Court stated in absolute terms that "neither vested property rights nor the obligation of contracts of third persons may be destroyed or impaired." Id. at 442. More specifically, the Court in Coombes held, "a contractual obligation arose; and the right to enforce it, having become vested, comes within the protection of both the contract impairment clause in Art. 1, § 10, and the due process of law clause in the Fourteenth Amendment, of the Federal

10

Constitution." Id. at 448. Honeywell also relies on Ettor v. City of Tacoma, 228 U.S. 148, 158 (1913), where the Supreme Court held that a statutory right to compensation for property damage caused by the city in the course of grading streets, which right to compensation was complete before a repeal of the cause of action, was a vested property right that could not be retroactively destroyed. Claiming that these cases control the outcome of the case at hand, the Honeywell trustee asserts a vested right to payment under the Act as it existed when ELIC became insolvent, prior to the 1992 amendment.

The Association, on the other hand, urges us to follow more recent Supreme Court precedents in which the Court reviews economic legislation with a very deferential eye and does not accord vested rights status to economic rights. The Association observes that under this modern approach, due process is satisfied as long as a reasonable legislative purpose supports the retroactive application of the legislation. The Association contends that the retroactive 1992 amendment is supported by a reasonable legislative purpose, and alternatively, that no vested rights accrued in favor of the Honeywell trustee upon ELIC's insolvency.

In one sense, both arguments are right. The Supreme Court has never expressly overruled the reasoning of Ettor and Coombes, which accords great protection to accrued statutory causes of action. In the area of economic legislation, however, we cannot ignore the abundance of cases where substantive due process has evolved into a deferential rational basis analysis. We believe that an understanding of the historical context of Ettor and Coombes is essential to divine accurately the present weight of their authority on the issue before us. See Hammond v. United States, 786 F.2d 8, 11 (1st Cir. 1986) (questioning the continued vitality of Coombes and Ettor because recent cases have retroactively abridged economic and real property rights without always carefully distinguishing these prior cases). See also W. David Slawson,

11

Constitutional and Legislative Considerations in Retroactive Lawmaking, 48 Cal. L. Rev. 216, 232 (1960) ("The decision [of Coombes v. Getz] seems far too rigid in its conception of permissible legislative change and would almost certainly not be followed today.").

Ettor and Coombes were decided during what is referred to in the history of American jurisprudence as the Lochner era, named for the pivotal case of judicial activism, Lochner v. New York, 198 U.S. 45 (1905) (invalidating maximum work hours legislation as an unconstitutional exercise of police power). Cases of that era frequently invalidated statutes that limited economic autonomy in a manner thought by the Court to be unnecessary or unwise, but in more recent decisions, the Court plainly sees its role differently: "[W]e do not sit as a super legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423 (1952). The reasoning prevalent during the "Lochner [era] has been implicitly rejected many times." Whalen v. Roe, 429 U.S. 589, 597 & n.18 (1977). See also United States v. Carlton, 114 S. Ct. 2018, 2023-24 (1994) (recognizing that three tax cases from the Lochner era "were decided during an era characterized by exacting review of economic legislation under an approach that `has long since been discarded'" (citation omitted)); Planned Parenthood of S.E. Pa. v. Casey, 505 U.S. 833, 861 (1992) (recognizing that the demise of Lochner era reasoning began in West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937)).

Within two years of the Coombes decision, substantive due process analysis in the area of retroactive economic legislation began to be framed in terms of reasonableness, drifting away from the Lochner era's strict protection of economic freedom and vested rights. See Blaisdell, 290 U.S. at 438 (upholding as an emergency measure a mortgage moratorium law that impaired obligations on mortgage contracts). The Court acknowledged that even the

12

expressly protected obligation of contracts (and similarly, we believe, the concept of vested rights) may be impaired by economic legislation if "the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end."  Id.  This rational basis substantive due process test appears to have supplanted the legislatively restrictive vested rights mode of analysis, and allows legislatures more freedom in dealing with economic situations.  See, e.g., James L. Kainen, The Historical Framework for Reviving Constitutional Protection for Property and Contract Rights, 79 Cornell L. Rev. 87, 119 (Nov. 1993) ("Modern jurists reject the categorical logic of vesting and consider the statute's justifications under the rubric of substantive due process."); Charles B. Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 696-97 (1959-60) (noting that the vested rights analysis has been replaced by balancing three factors:  (1) the nature and strength of the public interest served by the statute, (2) the extent to which the statute modifies or abrogates a preenactment right, and (3) the nature of the right altered by the statute).

In 1976, the Court announced, "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."  Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976).  These authorities leave no doubt that, even though Coombes and Ettor have never been overruled by the Supreme Court, the modern framework for substantive due process analysis concerning economic legislation requires only an inquiry into whether the legislation is reasonably related to a legitimate governmental purpose. Given the criticism surrounding the Court's Lochner era decisions in general, coupled with the development of judicial deference to economic legislation since then, we join those who question the continued validity of the

vested rights analysis of <u>Coombes</u> and <u>Ettor</u> when reviewing the constitutionality of economic legislation, recognizing as we must that only the Supreme Court itself can overrule its precedents.  We rely instead on the more recent Supreme Court pronouncements of substantive due process analysis for economic legislation, which articulate a rational basis test.

Our task, then, is to determine whether the retroactive application of the 1992 amendment is justified by a rational legislative purpose, or whether it is illegitimate and arbitrary.  Retroactive legislation, like prospective legislation, must meet the reasonableness test of due process. <u>Usery</u>, 428 U.S. at 17.  "But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose."  <u>Pension Benefit Guar. Corp. v. R. A. Gray & Co.</u>, 467 U.S. 717, 730 (1984).  Retroactive economic legislation has been upheld as reasonable even in circumstances where it destroys a settled expectancy or imposes a new liability.  <u>See, e.g.</u>, <u>Carlton</u>, 114 S. Ct. at 2022-23 (upholding a curative measure that took away an expected and relied upon deduction for estate tax); <u>Gray</u>, 467 U.S. at 734 (upholding retroactive application of ERISA's withdrawal liability as supported by rational legislative purpose); <u>Usery</u>, 428 U.S. at 19-20 (upholding retroactive aspects of Black Lung Benefits Act of 1972, which required employers to compensate former employees disabled by a work-related disease).  The Court has repeatedly noted that although certain economic liabilities or burdens were not anticipated, nevertheless, "`"our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."'"  <u>Concrete Pipe & Prod. v. Constr. Laborers Pension Trust</u>, 113 S. Ct. 2264, 2287 (1993) (quoting <u>Gray</u>, 467 U.S. at 729, quoting <u>Usery</u>, 428 U.S. at 16).

Using these standards, we conclude that the 1992 amendment redefining "contractual obligation" was neither arbitrary nor

14

illegitimate.   The state has a legitimate interest in regulating the insurance industry, easing the economic burdens of its own residents, and ensuring the economic life of an association created by its statute to protect its residents.   The general purpose of the Act at issue in this case "is to protect the future financial stability of individuals," Minnesota Life & Health Ins., 400 N.W.2d at 773, and the preamendment Act expressly provided protection to "residents" to whom "contractual obligations" are owed.   Minn. Stat. § 61B.06, subd. 2 (1986).   The 1992 amendment serves to narrow the definition of contractual obligation, explicitly providing coverage only to resident plan participants.   This is a legitimate purpose.

The 1992 amendment is also curative in nature, even though it worked a substantive change in the law.   See Honeywell, 518 N.W.2d at 560-63 (holding that the amendment worked a substantive change in the law because before the amendment, it plainly entitled resident policy owners, including trustees, to coverage).   Curative legislation corrects an unintended and unanticipated mistake in the underlying legislation, which went undetected until some time after the original enactment.   Certainly, legislatures have the authority to cure inadvertent defects in their legislation.   See Carlton, 114 S. Ct. at 2022 (upholding Congress's attempt to cure a defect in the tax code).   In Carlton, the Court concluded that Congress's purpose in retroactively taking away an estate tax deduction, even though the decedent's executor had relied upon it, was neither illegitimate nor arbitrary because "Congress acted to correct what it reasonably viewed as a mistake in the original 1986 provision that would have created a significant and unanticipated revenue loss."   114 S. Ct. at 2023.   We also note the observation of one commentator that "the individual who claims that a vested right has arisen from the defect is seeking a windfall since, had the legislature's . . . action had the effect it was intended to and could have had, no such right would have arisen."   Hochman, supra at 705.

15

Here, the Minnesota legislature acted reasonably when it gave retroactive effect to the 1992 amendment in order to cure a drafting defect that might have inadvertently left thousands of Minnesota residents without coverage under the Act due to the ELIC debacle. We agree with the observation of the Supreme Court of Minnesota: "Given that unallocated annuity contracts were not prevalent at the time of the statute's enactment in 1977, the legislature likely did not contemplate how the Act specifically applied to these contracts." Honeywell, 518 N.W.2d at 561. Absent retroactive effect, an unintended gap in coverage would have left many Minnesota resident workers without coverage, while an unintended windfall in favor of nonresident workers who had a Minnesota trustee would have strained the financial capabilities of the Association and required Minnesota residents to pay higher premiums to finance the Association's obligation to out-of-state residents. In sum, "the interest in the retroactive curing of such a defect in the administration of government outweighs the individual [trustee's] interest in benefiting from the defect." Hochman, supra at 705-06. Thus, we conclude that retroactive application of the 1992 amendment was a rational means by which to accomplish the state's legitimate goals.

Honeywell contends that retroactive application is arbitrary and irrational because there is no connection linking the Honeywell trustee to the ELIC failure that triggered coverage and because the amendment has a disparate impact on non-residents. Neither contention has merit. We have already determined that the retroactive application of the amendment was rational and prevented an unanticipated gap in coverage for resident plan participants and an unexpected windfall for nonresident plan participants. Because the context here is curative in nature, there is no need to demonstrate any connection of the Honeywell trustee to the ELIC failure in order for the legislation to be rational. We agree with the Association's contention that the amendment actually eliminates the arbitrary aspect of the prior legislation under which Minnesota

16

residents may or may not have had coverage for their plan funds, depending solely upon the arbitrary residence of their plan trustee, over which they have no control.  Additionally, the disparate impact results only from the state's legitimate interest in maintaining the welfare of its own citizens, not from arbitrariness or discrimination.  Retroactive application does not deprive nonresidents of any rights (except the expectation of coverage based on the arbitrary residence of their trustee), and it does not place any added burdens or liabilities on nonresidents.

To the extent Honeywell argues that this case is fully controlled by Coombes and Ettor, we also disagree.  As already noted, we question the continued vitality of these cases.  Furthermore, even assuming they remain authoritative, we conclude that they do not control the outcome in this situation.  In our view, Ettor and Coombes do not stand for the proposition that an inviolable vested right exists whenever a statutory economic right accrues.  In Coombes, the Court expressly protected what had become a vested contract right, independent of the statute.  285 U.S. at 448.  We have previously concluded that no contract rights are implicated by the 1992 amendment.  This case involves legislation of economic matters which exist only by statute and have not been integrated into a private contract, and Honeywell did not even make choices in reliance on the preamendment Act.  In Ettor, the Court protected a cause of action that provided a remedy for property damage to private property that occurred while the city graded streets for public use.  228 U.S. at 156.  In the present case, neither the state nor the Association caused a harm and then took away a remedy for the injury caused, as the city and state did in Ettor.

In sum, Coombes and Ettor are not directly applicable to the case at hand because each involves an element distinguishable from the type of economic legislation at issue here.  Thus, even if Coombes and Ettor apply, they do not dictate a conclusion that

17

accrued economic rights under the preamendment Act rise to the level of a vested right. Rather, in spite of the expectancies that may have been based upon the preamendment Act, the retroactive 1992 amendment was a rational means by which to accomplish the legitimate economic goal of ensuring the welfare of Minnesota resident workers.

### III. CONCLUSION

Finding no violation of either the Contract Clause or the Due Process Clause through retroactive application of the 1992 amendment, we affirm the judgment of the district court.

A true copy.

    Attest:


        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.