# GENERAL MOTORS CORP. ET AL. *v.* ROMEIN ET AL.

No. 90–1390.   Argued December 10, 1991—Decided March 9, 1992

182

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Kenneth S. Geller* argued the cause for petitioners. With him on the briefs were *Stephen M. Shapiro, Mark I. Levy, James D. Holzhauer, Charles A. Rothfeld, Lawrence C. Marshall, John M. Thomas, Theodore Souris, Martha B. Goodloe,* and *Daniel G. Galant.*

*Theodore Sachs* argued the cause for respondents. With him on the brief for respondents Romein and Gonzalez were

*Robert M. Weinberg* and *Laurence Gold.* *Frank J. Kelley,* Attorney General of Michigan, *pro se, Gay Secor Hardy,* Solicitor General, and *Thomas L. Casey,* Assistant Solicitor General, filed a brief for respondent Kelley.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1987, the Michigan Legislature enacted a statute that had the effect of requiring petitioners General Motors Corporation (GM) and Ford Motor Company (Ford) to repay workers' compensation benefits GM and Ford had withheld in reliance on a 1981 workers' compensation statute. Petitioners challenge the provision of the statute mandating these retroactive payments on the ground that it violates the Contract Clause and the Due Process Clause of the Federal Constitution.

I

Since at least 1974, workers' compensation law in Michigan has been the subject of legislative study and bitter debate. VanderLaan & Studley, Workers' Compensation Reform: A Case Study of the Legislative Process in Michigan, 14 U. Mich. J. L. Ref. 451, 452–454 (1981). "Literally dozens of conflicting legislative proposals" were offered each year, and all were fought to a standstill by competing interest groups. *Id.,* at 453. The legislative logjam was finally broken in 1980, when the Governor and four legislative leaders began a series of negotiations leading to an agreement on reforms.

---

*Briefs of *amici curiae* urging reversal were filed for Citizens Insurance Co. of America et al. by *Donald S. Young* and *Kathleen McCree Lewis;* for the Motor Vehicle Manufacturers Association of the United States, Inc., et al. by *David A. Strauss, William H. Crabtree, Dwight H. Vincent, J. Walker Henry,* and *Rachelle G. Silberberg;* and for the Washington Legal Foundation by *Scott G. Campbell, Daniel J. Popeo,* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Starr, Christopher J. Wright, Richard H. Seamon, Allen H. Feldman, Kerry L. Adams,* and *Ellen L. Beard;* and for the Council of State Governments et al. by *Richard Ruda* and *David Shapiro.*

"Neither side was able to obtain everything it wanted—possibly a good indication of the degree of balance this compromise represents." *Id.*, at 458.

Among other things, the 1980 legislation raised maximum weekly benefits to 90% of the state average weekly wage, and provided workers injured before 1980 an annual supplemental adjustment of their benefits of up to five percent. Mich. Comp. Laws Ann. §§ 418.355(2), 418.352(1) (West 1982). In 1981, the legislature enacted a statute allowing employers to decrease workers' compensation benefits to those disabled employees eligible to receive wage-loss compensation from other employer-funded sources. § 418.354. This provision, allowing what is called "benefit coordination," is at the heart of the controversy in this case.

The benefit coordination provision did not specify whether it was to be applied to workers injured before its effective date, March 31, 1982. Petitioners took the position that the 1981 law allowed them to reduce workers' compensation benefits to workers injured before March 31, 1982, who were receiving benefits from other sources. For example, GM cut respondent Romein's weekly payment by $132 per week, and Ford cut respondent Gonzalez' payment by $176 per week. The lower state courts disagreed with petitioners' interpretation, holding that coordination was allowed only for employees injured after 1982. See, *e. g., Franks* v. *White Pine Copper Div., Copper Range Co.*, 122 Mich. App. 177, 185, 332 N. W. 2d 447, 449 (1982). Both Houses of the Michigan Legislature passed a concurrent resolution declaring that the coordination provisions were "not designed to disrupt benefits which were already being received by an employee prior to the effective date of this act or benefits resulting from injuries incurred prior to the act's effective date." See Senate Con. Res. 575, adopted by the Senate on April 1, 1982, and by the House on May 18, 1982; 1982 Senate J. 626, 706–707; 1982 House J. 1262. The same year, a bill was introduced in the Michigan Senate to amend the statute in this respect,

but it was not passed. Senate Bill 834, introduced on May 26, 1982.

Meanwhile, petitioners continued to attempt to persuade the Michigan courts that the 1981 statute should be applied to workers injured before its effective date. In 1985, petitioners' interpretation was accepted by the Michigan Supreme Court. *Chambers* v. *General Motors Corp.*, decided with *Franks* v. *White Pine Copper Div., Copper Range Co.*, 422 Mich. 636, 375 N. W. 2d 715. The court held that the benefit coordination provision applied to all payment periods after its effective date, regardless of the date the employee had been injured. The court also held that application of the coordination provisions to employees injured before 1982 did not violate the Contract Clause or the Due Process Clause.

After the decision in *Chambers*, employers who had not coordinated benefits for employees injured before 1982 began to demand reimbursement from these employees. See Jones, Firms Cut Checks for Disabled Workers, Detroit Free Press, Nov. 29, 1985, p. 3A. The Michigan Legislature responded almost immediately by introducing legislation to overturn the court's decision. On October 16, 1985, before the Michigan Supreme Court had ruled on the motion for rehearing in *Chambers*, House Bill 5084 was introduced. As amended and passed by the House on January 29, 1986, the bill repudiated the *Chambers* decision, declared that employers who had not coordinated benefits before the *Chambers* decision could not seek reimbursement from affected employees, and required employers who had coordinated benefits before *Chambers* to reimburse their employees. Meanwhile, the Senate passed its own version of the bill, Senate Bill 67, also disapproving the *Chambers* decision and providing that employers could not require employees to reimburse them for benefits not coordinated after 1982. The Senate bill was amended by a Conference Committee to provide for reimbursement of benefits withheld as a result of coordina-

tion, putting employers who had coordinated benefits for previously disabled workers in the same position as those who had not.  House Legislative Analysis of Senate Bill 67, p. 2 (May 7, 1987).  The amended Senate bill passed into law on May 14, 1987.  1987 Mich. Pub. Acts No. 28.

As a result of the 1987 statute, petitioners were ordered to refund nearly $25 million to disabled employees.  They protested that the provision requiring reimbursement of benefits withheld was unfairly retroactive and violated the Contract Clause and the Due Process Clause.  The Michigan Supreme Court upheld the statute against these challenges, on the ground that the employers had no vested rights in coordination for Contract Clause purposes, and that the retroactive provisions furthered a rational legislative purpose. 436 Mich. 515, 462 N. W. 2d 555 (1990).  We granted certiorari, 500 U. S. 915 (1991), and now affirm.

## II

Article I, § 10, of the Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." Petitioners claim that the 1987 statute requiring reimbursement of benefits withheld in reliance on the 1981 coordination provisions substantially impaired the obligation of the contracts with their employees.

Generally, we first ask whether the change in state law has "operated as a substantial impairment of a contractual relationship."  *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234, 244 (1978); *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 411 (1983).  This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.  Normally, the first two are unproblematic, and we need address only the third.  In this case, however, we need not reach the questions of impairment, as we hold that there was no

contractual agreement regarding the specific workers' compensation terms allegedly at issue.

The contracts allegedly impaired by the 1987 statute are employment contracts entered into after collective bargaining between petitioners and respondents. It is undisputed that the contracts themselves were formed before the 1981 law was enacted requiring benefit coordination. It is also undisputed that the contracts make no express mention of workers' compensation benefits. Petitioners argue that the workers' compensation law is an implied term of the contracts, because the parties bargained for other compensation with workers' compensation benefits in mind. This implied term that was allegedly impaired by the 1987 statute is defined as a promise to pay the amount of workers' compensation required by law for each payment period. Once performance of this obligation is completed by making payments for any disability period, petitioners claim that they have a settled expectation that cannot be undone by later state legislation. Because the 1987 statute "reopens" these closed transactions, petitioners contend its retroactive provisions violate the Contract Clause.

The Michigan Supreme Court held that the term suggested by petitioners was not an implied term of the employment contracts between petitioners and respondents. We "accord respectful consideration and great weight to the views of the State's highest court," though ultimately we are "bound to decide for ourselves whether a contract was made." *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 100 (1938). The question whether a contract was made is a federal question for purposes of Contract Clause analysis, see *Irving Trust Co.* v. *Day*, 314 U. S. 556, 561 (1942), and "whether it turns on issues of general or purely local law, we can not surrender the duty to exercise our own judgment." *Appleby* v. *City of New York*, 271 U. S. 364, 380 (1926). In this case, however, we see no reason to disagree with the Michigan Supreme Court's conclusion.

While it is true that the terms to which the contracting parties give assent may be express or implied in their dealings, cf. *Garrison* v. *City of New York,* 21 Wall. 196, 203 (1875), the contracting parties here in no way manifested assent to limiting disability payments in accordance with the 1981 law allowing coordination of benefits. The employment contracts at issue were formed before the 1981 law allowing coordination of benefits came into effect. Thus, there was no occasion for the parties to consider in bargaining the question raised here: whether an unanticipated reduction in benefits could later be restored after the "benefit period" had closed.

Petitioners argue that their right to rely on past payment periods as "closed" is a contractual term "incorporated" by law into the employment contracts, regardless of the assent, express or implied, of the parties. While petitioners cite passages from our prior decisions that " 'the laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it,' " *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 429–430 (1934) (quoting *Von Hoffman* v. *City of Quincy,* 4 Wall. 535, 550 (1867)), that principle has no application here, since petitioners have not shown that the alleged right to rely on past payment periods as closed was part of Michigan law at the time of the original contract. Though Michigan courts, in awarding interest on unpaid workers' compensation awards, had held that such awards were more analogous to contractual damages than tort damages, see, *e. g., Wilson* v. *Doehler-Jarvis Division of National Lead Co.,* 358 Mich. 510, 517–519, 100 N. W. 2d 226, 229–230 (1960); *Brown* v. *Eller Outdoor Advertising Co.,* 139 Mich. App. 7, 14, 360 N. W. 2d 322, 326 (1984), Michigan law does not explicitly imply a contractual term allowing an employer to depend on the closure of past disability compensation periods. Moreover, such right does not appear to be so central to the bargained-for exchange between the par-

ties, or to the enforceability of the contract as a whole, that it must be deemed to be a term of the contract.

Contrary to petitioners' suggestion, we have not held that all state regulations are implied terms of every contract entered into while they are effective, especially when the regulations themselves cannot be fairly interpreted to require such incorporation. For the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts. See *United States Trust Co. of N. Y. v. New Jersey*, 431 U. S. 1, 19, n. 17 (1977).

While it is somewhat misleading to characterize laws affecting the enforceability of contracts as "incorporated terms" of a contract, see 3 A. Corbin, Contracts § 551, pp. 199–200 (1960), these laws are subject to Contract Clause analysis because without them, contracts are reduced to simple, unenforceable promises. "The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them as the measure of the obligation to perform them by the one party, and the right acquired by the other. . . . If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract." *McCracken v. Hayward*, 2 How. 608, 612 (1844). See also *Von Hoffman v. City of Quincy, supra.* A change in the remedies available under a contract, for example, may convert an agreement enforceable at law into a mere promise, thereby impairing the contract's obligatory force. See *Sturges v. Crowninshield*, 4 Wheat. 122, 197–198 (1819); *Edwards v. Kearzey*, 96 U. S. 595, 601 (1878). For this reason, changes in the laws that make a contract legally enforceable may trigger Contract Clause scrutiny if they impair the obligation of pre-existing contracts, even if they do not alter any of the contracts' bargained-for terms. See, *e. g., Von Hoffman v. City of Quincy, supra* (repeal of tax designed to

repay bond issue); *Bronson* v. *Kinzie,* 1 How. 311, 316 (1843) (law limiting foreclosure rights); *McCracken, supra,* at 611–614 (same).

The 1987 statute did not change the legal enforceability of the employment contracts here. The parties still have the same ability to enforce the bargained-for terms of the employment contracts that they did before the 1987 statute was enacted. Moreover, petitioners' suggestion that we should read every workplace regulation into the private contractual arrangements of employers and employees would expand the definition of contract so far that the constitutional provision would lose its anchoring purpose, *i. e.,* "enabl[ing] individuals to order their personal and business affairs according to their particular needs and interests." *Allied Structural Steel,* 438 U. S., at 245. Instead, the Clause would protect against all changes in legislation, regardless of the effect of those changes on bargained-for agreements. The employment contract, in petitioners' view, could incorporate workplace safety regulations, employment tax obligations, and laws prohibiting workplace discrimination, even if these laws are not intended to affect private contracts and are not subject to bargaining between the employer and employees. Moreover, petitioners' construction would severely limit the ability of state legislatures to amend their regulatory legislation. Amendments could not take effect until all existing contracts expired, and parties could evade regulation by entering into long-term contracts. The ultimate irony of petitioners' proposed principle is that, taken to an extreme, it would render the Contract Clause itself entirely dependent on state law. As Justice Story pointed out:

> "It has been contended, by some learned minds, that the municipal law of a place where a contract is made forms a part of it, and travels with it, wherever the parties to it may be found. If this were admitted to be true, the consequence would be, that all the existing laws of a State, being incorporated into the contract, would con-

stitute a part of its stipulations . . . . If, therefore, the legislature should provide, by a law, that all contracts thereafter made should be subject to the entire control of the legislature, as to their obligation, validity, and execution, whatever might be their terms, they would be 'completely within the legislative power, and might be impaired or extinguished by future laws; thus having a complete *ex post facto* operation." 2 J. Story, Commentaries on the Constitution of the United States § 1383, pp. 252–253 (5th ed. 1891).

## III

Petitioners also contend that the 1987 statute violated due process because its retroactive provisions unreasonably interfered with closed transactions. Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions. For this reason, "[t]he retroactive aspects of [economic] legislation, as well as the prospective aspects, must meet the test of due process": a legitimate legislative purpose furthered by rational means. *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.,* 467 U. S. 717, 730 (1984).

The statute in this case meets that standard. The purpose of the 1987 statute was to correct the unexpected results of the Michigan Supreme Court's *Chambers* opinion. The retroactive repayment provision of the 1987 statute was a rational means of meeting this legitimate objective: It preserved the delicate legislative compromise that had been struck by the 1980 and 1981 laws—giving workers injured before 1982 their full benefits without coordination, but not the greater increases given to subsequently injured workers. Also, it equalized the payments made by employers who had gambled on the *Chambers* decision with those made by employers who had not. Cf. *United States* v. *Sperry Corp.,* 493

U. S. 52, 64–65 (1989) (legitimate to legislate retrospectively in order to ensure that similarly situated persons bear similar financial burdens of program).

In sum, petitioners knew they were taking a risk in reducing benefits to their workers, but they took their chances with their interpretation of the 1981 law. Having now lost the battle in the Michigan Legislature, petitioners wished to continue the war in court. Losing a political skirmish, however, in itself creates no ground for constitutional relief.

*Affirmed.*