TRAIL MOUNTAIN COAL COMPANY,
Plaintiff, Respondent, and Cross–
Petitioner,

v.

The UTAH DIVISION OF STATE
LANDS AND FORESTRY; Ralph
Miles, Director of the Division of State
Lands and Forestry; The Utah Board
of State Lands and Forestry; The Utah
Department of Natural Resources; Dee
Hansen, Executive Director of the Utah
Department of Natural Resources, De-
fendants, Petitioners and Cross–Re-
spondents.

No. 940556.

Supreme Court of Utah.

June 28, 1996.

Rehearing Denied Aug. 23, 1996.

Richard G. Wilkins, William B. Prince, Salt Lake City, for plaintiff.

Jan Graham, Atty. Gen., Clark B. Allred, Gayle F. McKeachnie, Steven F. Alder, Asst. Attys. Gen., for defendants.

STEWART, Associate Chief Justice:

This case involves a dispute between the Utah Division of State Lands and Forestry (the "Division") and Trail Mountain Coal Company ("Trail Mountain") concerning prejudgment interest and penalties assessed on delinquent lease payments. The lease in question was issued by the State of Utah. It permitted Trail Mountain to mine coal on a parcel of school trust lands near Orangeville, Utah.[1] We granted the Division's petition for review of the Court of Appeals' decision upholding the trial court's ruling that the Division is not entitled to the interest and penal-

---

**1.** Pursuant to the Utah Enabling Act, the Utah Division of State Lands and Forestry manages school trust lands (granted to the State by the United States Government for the purpose of

ty rates assessed pursuant to regulations of the Board of State Lands and Forestry (the "Board"). 892 P.2d 13 (Utah 1995). We now reverse.

## I. PROCEDURAL BACKGROUND

Trail Mountain's mine encompasses three separate leases. Trail Mountain entered into two of those leases with the federal government. The third lease is the state lease, ML–22603 (the "Lease"), involved in this controversy. It was originally issued to Malcolm McKinnon in 1965. McKinnon assigned the Lease to Myron F. Fetterolf in 1979, who later assigned it to Trail Mountain.[2] Between 1979 and 1985, the mine was in constant operation. The controversy now presented to us arises out of Trail Mountain's obligation pursuant to the royalty clause of the state-issued Lease. The relevant portions of that provision read as follows:

> The Lessee, in consideration of the granting of the rights and privileges aforesaid, hereby covenants and agrees as follows:
>
> . . . .
>
> To pay to Lessor quarterly, on or before the 15th day of the month succeeding each quarter, royalty
>
> (a) at the rate of $.15 per ton of 2000 lbs. of coal produced from the leased premises and sold or otherwise disposed of, or
>
> (b) at the rate prevailing, at the beginning of the quarter for which payment is being made, for federal lessees of land of similar character under coal

leases issued by the United States at that time,

whichever is higher.

The Lease also stated that it was "granted subject in all respects to and under the conditions of the laws of the State of Utah and existing rules and regulations and such operating rules and regulations as may be hereafter approved and adopted by the State Land Board."

When the Lease was originally issued in 1965, the standard royalty rate on similar federal leases was 15 cents per ton. Prior to 1976, Trail Mountain's predecessors in interest paid royalties under the Lease according to the amount specified in subsection (a) of the alternate royalties provision of the Lease (i.e., a flat rate of 15 cents per ton). In 1976, however, Congress enacted the Federal Coal Leasing Amendments Act. Pub.L. No. 94–377, 90 Stat. 1083 (1976), codified at 30 U.S.C. §§ 201–09. Pursuant to regulations promulgated under those amendments, coal removed from underground mines was presumptively subject to "a royalty of not less than 8 percent of the value of coal removed." 43 C.F.R. § 3473.3–2(a)(3) (1979). Thereafter, any new leases issued by the federal government for coal extraction from underground mines were generally subject to an eight percent royalty rate.[3] Trail Mountain's predecessors in interest and Trail Mountain, however, continued to pay under subsection (a) of the Lease.[4] Thus, from 1979 through 1985, Trail Mountain paid a royalty of 15 cents per ton on all coal extracted from the school trust land subject to the Lease. The Division received these payments without

---

supporting the common schools), in accordance with the rules and regulations promulgated by the Board of State Lands and Forestry. *See* Utah Code Ann. §§ 65–1–18 to –23 (1986). For current provisions relating to the Board's management duties with respect to mineral leases, see section 65A–1–2 and chapter 6 of the same title.

2. According to the Division, Trail Mountain was owned by the "Fetterolf Group, Inc.," and Trail Mountain was the entity which extracted the coal beginning in 1979, even though the Lease was not formally assigned to it until sometime later.

3. The regulations did allow an authorized officer to assess a lesser amount if special conditions warranted.

4. Trail Mountain also held two federal leases operating out of the same mine. The first federal lease, U–082996, was issued in 1962, at a royalty rate of 15 cents per ton. In 1983, the second federal lease, U–49322, was issued at a royalty rate of eight percent of the value of the coal removed from the mine. At that time, Trail Mountain's other federal lease was likewise readjusted to the eight percent royalty rate.

protest, and various Division employees apparently informed Trail Mountain that 15 cents per ton was the correct rate for the Lease.

In 1984 and 1985, however, the Division conducted an audit of coal leases on school trust lands and concluded that subsequent to passage of the Federal Coal Leasing Amendments Act and accompanying regulations, companies extracting coal from underground mines on school trust lands had a duty to pay eight percent of the value of that coal. On October 15, 1985, the Division notified Trail Mountain that it had underpaid the required royalties by $3,351,474.75. The audit report also assessed $1,854,115.69 in interest and $16,606.76 as a penalty for late payment. The interest was calculated at six percent for the period of November 1, 1979, to June 30, 1981, on the basis of the statutory rate provided by Utah Code Ann. § 15–1–1; at ten percent for the period of July 1, 1981, to November 30, 1982, on the basis of the revised statutory rate;[5] and at eighteen percent for the period of December 1, 1982, to October 15, 1985, on the basis of a regulation adopted by the Board in November of 1982.[6] The penalty was based on a rule promulgated by the Division in December of 1983.

Trail Mountain contested these assessments. It exhausted its administrative remedies and then filed an action in district court to enjoin the Division from collecting the back royalties, interest, and penalties. Trail Mountain argued that the Division had misinterpreted the royalty payment provision and, in any event, was estopped from claiming that Trail Mountain owed the sums assessed. The trial court granted Trail Mountain's motion for summary judgment. On appeal, Trail Mountain's case was consolidated with

three others in *Plateau Mining Co. v. Utah Division of State Lands & Forestry,* 802 P.2d 720 (Utah 1990). In that decision, this Court reversed the trial court and remanded for further proceedings. *Id.* at 732. The trial court subsequently conducted a three-day bench trial and determined that Trail Mountain had a duty to pay royalties at a rate of eight percent during the audit period (1979 to 1985). The court also assessed a six percent per annum interest charge on all delinquent payments during the same period. Trail Mountain appealed that judgment in most of its particulars. The Division cross-appealed, claiming that the trial court should have awarded a higher interest rate for certain portions of the audit period and additional late fees.

Contemporaneously, another of the *Plateau Mining* litigants, Consolidation Coal Company ("Consol") appealed from a similar trial court result. This Court accepted Consol's appeal for decision but transferred Trail Mountain's appeal to the Court of Appeals. *See* Utah Code Ann. § 78–2–2(4). In *Trail Mountain Coal Co. v. Utah Division of State Lands & Forestry,* 884 P.2d 1265 (Ct.App. 1994), *cert. granted,* 892 P.2d 13 (Utah 1995), the Court of Appeals upheld the trial court's assessment of the eight percent royalty rate,[7] ruled that the Division's recovery was limited by the seven-year statute of limitations in Utah Code Ann. § 78–12–2, further ruled that interest and penalties had not begun to accrue prior to the Division's first demand for payment, affirmed the six percent prejudgment interest rate set by the trial court, and denied the Division's request for additional interest and penalty payments. 884 P.2d at 1269–73.

*Trail Mountain* was issued by the Court of Appeals on October 27, 1994. Shortly

---

5. By its own terms, however, the revised statutory rate is not applicable "to any contract or obligations made before May 14, 1981."

6. In 1986, subsequent to the billing period at issue in this case, an adjustable interest rate based on the rate charged by the Internal Revenue Service plus four percent was established.

7. The Court of Appeals did, however, reverse the trial court with respect to Trail Mountain's appli-

cation for a transportation allowance deduction from the eight percent royalty. Such deductions are granted under federal leases. The Court of Appeals held that because the deduction is an integral factor in calculating the amount that would be due under federal leases, the same deduction is necessarily incorporated into the relevant state leasing provision requiring payment of the federal rate. The Division has not challenged this ruling in its petition.

thereafter, on December 2, this Court issued its decision in *Consolidation Coal Co. v. Utah Division of State Lands & Forestry*, 886 P.2d 514 (Utah 1994). Although similar arguments were presented in both cases, this Court's decision in *Consolidation Coal* differed from the Court of Appeals' decision in *Trail Mountain* in some significant respects. Most notably, in *Consolidation Coal* we held that with respect to coal leases on school trust lands, the interest and penalties assessed by the Board and the Division superseded the general prejudgment interest rate promulgated by statute. *Id.* at 527. In so ruling, we relied in part on the fact that "[t]he State has an irrevocable [constitutional] duty to manage ... trust lands for the sole benefit of the common schools and to receive 'full value' from any disposition of its school trust lands." *Id.* at 525. *Consolidation Coal* also implicitly rejected *Trail Mountain*'s holding that interest payments did not begin to accrue until the Division demanded payment on the back royalties. *Id.* at 524.

Before this Court, the Division argues that the Court of Appeals erred in applying the six percent statutory prejudgment interest rate to all of the back royalties. The Division asserts that collection of the higher interest and penalty rates assessed by the Board and the Division for certain periods of Trail Mountain's delinquent obligations is necessary to fulfill the Division's constitutional obligation to obtain "full value" from any disposition of school trust lands. The Division also argues that interest on each payment accrued from the date each payment became due, not at the time the Division first made a demand for payment.

Trail Mountain counters by asserting that notwithstanding *Consolidation Coal*'s ruling on the matter, application of the Division's interest and penalty rates violates the Contract Clauses of both the Utah and United States Constitutions and that owing to the "ambiguity" of the alternative rate provision, interest should be assessed only from the

date payment was first demanded by the Division. Trail Mountain also argues that a six-year statute of limitations, rather than the seven-year limitation employed by the Court of Appeals, applies to this dispute.

## II.  ANALYSIS

### A.  Contract Clause

█  We first address Trail Mountain's contention that regulations upheld by *Consolidation Coal* violate the Contract Clauses of both the Utah and United States Constitutions. In *Consolidation Coal*, we held:

> [T]he specific constitutional requirement that the State obtain full value for its school trust lands, in conjunction with the legislature's broad grant of authority to the Board and our case law indicating that the Board has such further implied powers as are reasonably necessary to carry out its constitutional duties, mandates the conclusion that the Board is empowered to set interest rates and penalties regarding school trust lands.

886 P.2d at 527. Hence, although we acknowledged the mandate imposed by the Utah Constitution to obtain full value for disposition of school trust lands, we did not specifically address the issue of whether the imposition of prejudgment interest rates promulgated subsequent to the issuance of a coal lease on school trust lands violates the Contract Clause of either the state or the federal constitution.

We did, however, address a question that is a fundamental predicate to any Contract Clause analysis—whether the rules and regulations promulgated by the Board impaired or changed the terms of the Lease. Consol asserted as one of its claims on appeal that the rules and regulations abrogated the terms of the Lease. *Id.* at 527–28. We rejected that contention by noting that Consol's argument failed "to recognize that the Lease is expressly subject to the laws of Utah." [8] *Id.* at 528. Trail Mountain's Lease

---

8. Obviously, there are natural limits to such pro-     visions. The State cannot simply opt out of

contained the same provision, which also expressly stated that the Lease was subject to the rules and regulations promulgated by the Board. Hence, when the Division sought to enforce the interest and penalty measures promulgated by the Board, it was merely acting pursuant to a right it held under the contract, and no contractual term of the Lease was impaired.

■ This Court also noted in *Consolidation Coal* that there is a critical difference "between interest provided for by contract and interest provided as damages." 886 P.2d at 528 n. 23. In other words, if a law changes or abrogates interest payments explicitly provided by the contract, such a law would impair the contractual rights of the parties; whereas, if a law merely changes the amount of interest provided by law as a remedy for breach of the contract, the underlying contract is not necessarily impaired. *Cf. Morley v. Lake Shore & Mich. S. Ry.*, 146 U.S. 162, 168–71, 13 S.Ct. 54, 56–58, 36 L.Ed. 925 (1892) (holding that interest assessed pursuant to judgment on breach of contract action was not itself contractually vested right immune to alteration by legislative action). Trail Mountain, relying on *General Motors Corp. v. Romein*, 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992), assails this remedies/rights distinction, essentially arguing that the six percent prejudgment rate prescribed by § 15–1–1 in 1965 was, for the purposes of Contract Clause analysis, effectively incorporated into the Lease.[9] Trail

Mountain correctly notes that *Romein* observed that not all laws affecting contractual remedies (as opposed to those directly impairing contractual rights) will survive Contract Clause scrutiny. 503 U.S. at 189, 112 S.Ct. at 1111. However, careful examination of *Romein* reveals a much more limited holding than that asserted by Trail Mountain. Specifically, the *Romein* Court stated, "For the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts." *Id.* at 189, 112 S.Ct. at 1111. Trail Mountain thus incorrectly interprets the scope of *Romein*'s holding. The Contract Clause does not "protect against all changes in legislation, regardless of the effect of those changes on bargained-for agreements." *Id.* at 190, 112 S.Ct. at 1111.

■ In this case, the regulations which altered the rate of prejudgment interest over time did not affect the "validity, construction, [or] enforcement" of the contract between Trail Mountain and the Division. Rather, the regulations simply affected the calculation of the remedy granted for a breach of the terms of the lease. As a matter of public policy, an award of prejudgment interest simply serves to compensate a party for the depreciating value of the amount owed over time and, as a corollary, deters parties from intentionally withholding an amount that is liquidated and owing. Laws dictating the particular rate of prejudgment interest on

Contract Clause scrutiny by including such language in all of their contractual agreements and then subsequently rely upon a legislative edict that otherwise clearly violates the Contract Clause. However, in this case we are not dealing with an unanticipated legislative action which abrogates the validity or enforcement of a provision of the contract at issue. Rather, Trail Mountain's Lease specifically provided for regulation by specific agencies, and the regulations that were actually imposed merely prescribed the method of calculating compensation for violation of the terms of the Lease. Hence, the nature and source of the interest and penalty provisions were reasonably foreseeable, and their imposition did not alter any of the essential elements of the contract.

9. Trail Mountain cites a number of Utah cases as support for its argument that "entitlement to prejudgment interest at the 'legal rate' is a term of every contract executed in the State of Utah." *See SCM Land Co. v. Watkins & Faber*, 732 P.2d 105, 108–09 (Utah 1986); *L & A Drywall, Inc. v. Whitmore Constr. Co.*, 608 P.2d 626, 629–30 (Utah 1980); *Mont Trucking, Inc. v. Entrada Indus., Inc.*, 802 P.2d 779, 782 (Utah.Ct.App.1990); *Breuer-Harrison, Inc. v. Combe*, 799 P.2d 716, 731–32 (Utah.Ct.App.1990); *Davies v. Olson*, 746 P.2d 264, 270 (Utah.Ct.App.1987); *Vasels v. LoGuidice*, 740 P.2d 1375, 1378 (Utah.Ct.App. 1987). None of these cases support Trail Mountain's assertion. Rather, they simply reaffirm that prejudgment interest is a purely statutory remedy arising out of a contractual breach.

delinquent sums are not vested contractual rights. Adjustments in the interest rate, so long as they are not unreasonably punitive, do not "convert an agreement enforceable at law into a mere promise"; nor do they "impair the obligation of pre-existing contracts." So long as the remedy of prejudgment interest is made available in a reasonable form and under appropriate circumstances, parties to a contract are not entitled to assume that one particular rate will predominate or that one particular legal provision governing its assessment will triumph over another. Trail Mountain's Contract Clause argument must fail.[10] Therefore, in light of our holding in *Consolidation Coal*, we reverse the Court of Appeals' ruling upholding the trial court's assessment of six percent prejudgment interest for the entire balance of Trail Mountain's overdue payments and remand with instructions to assess the properly promulgated Board rates of prejudgment interest and penalties for the period during which they were applicable.

### B. Demand for Payment

■ The Division also contests the Court of Appeals' holding that prejudgment interest did not begin to accrue until the Division made its first demand for payment of the overdue royalties on October 15, 1985. The general rule is that "where the damage is complete and the amount of loss is fixed as of a particular time, and that loss can be measured by facts and figures, interest should be allowed from that time." *Bjork v. April Industries, Inc.*, 560 P.2d 315, 317 (Utah 1977). In *Consolidation Coal*, we followed *Bjork*, holding that prejudgment interest on Consol's overdue royalties accrued

from the date the payments were due. 886 P.2d at 523–24. The Court of Appeals, however, assumed that *Staker v. Huntington Cleveland Irrigation Co.*, 664 P.2d 1188, 1191 (Utah 1983), controlled. In *Staker*, the defendant irrigation company contracted with the plaintiff to provide a particular quantity of water. The plaintiff paid for the contracted amount but received a lesser quantity of water. This Court held, without further elaboration, that prejudgment interest on the overpaid amounts began only at the time the plaintiff demanded return of the surplus payments. *Id.* at 1191. Because the holding in *Consolidation Coal* specifically addresses the situation in this case and because *Staker* presented a relatively unique fact situation involving a refund of overpaid amounts, we hold that *Consolidation Coal* controls rather than *Staker*, and we reverse the Court of Appeals' ruling on that issue.

### C. Statute of Limitations

■ In its cross-petition, Trail Mountain contests the Court of Appeals' ruling that the Division's recovery was limited by the seven-year statute of limitations provided by Utah Code Ann. § 78–12–2.[11] That provision reads as follows:

> The State will not sue any person for or in respect to any real property, or the issues or profits thereof, by reason of the right or title of the state to the same, unless: (1) such right or title shall have accrued within seven years before any action or other proceeding for the same shall be commenced; or (2) the state or those from whom it claims shall have received the rents and profits of such real property, or some part thereof, within seven years.

---

**10.** In framing its argument, Trail Mountain alleged violations of both the federal, Art. I, § 10, and state, Art. I, § 18, constitutions. Because analysis under either provision necessarily begins with the same threshold question of whether a contract was in fact impaired, it is unnecessary in this case to address them separately.

**11.** The Division did not contest application of the statute in its petition for certiorari and likewise failed to do so in its opening brief. Only in its reply brief does the Division now argue that

application of *any* statute of limitations is improper. The Division's argument on this matter again relies primarily on the state constitutional mandate to obtain full value for school trust lands. Nevertheless, regardless of the nature of the question, constitutional or otherwise, this Court is entitled to a full and proper presentation of the issues presented for review. We do not address the validity of the Division's argument because the Division has waived it.

Trail Mountain argues that the Court of Appeals should have instead applied the six-year limitation provided by Utah Code Ann. § 78–12–23(2) for "[a]n action upon any contract, obligation, or liability founded upon an instrument in writing." Specifically, Trail Mountain asserts that the language "by reason of the right or title of the state to the same" in § 78–12–2 limits the applicability of the statute to cases where the state sues for the right or title to the real property itself—i.e., adverse possession suits.

We disagree. A plain reading of the statute reveals that it applies to actions brought by the state as a consequence of the state's claim of right to real property or issues or profits derived from real property. If, as Trail Mountain claims, the statute were limited to adverse possession claims, the language "or the issues or profits thereof" would be rendered superfluous. "This court will not construe a statute in such a way as to render certain viable parts meaningless and void." *Nelson v. Salt Lake County*, 905 P.2d 872, 876 (Utah 1995). In this case, the Division is alleging that Trail Mountain withheld issues or profits derived from leased school trust lands, and the Division, as a state agency, brought suit by virtue of its right to receive those profits. This lawsuit therefore fits within the express terms of § 78–12–2, and consequently, we uphold the ruling of the Court of Appeals as to its applicability.

The ruling of the Court of Appeals is affirmed in part and reversed in part, and we remand for further proceedings consistent with this opinion.

ZIMMERMAN, C.J., and HOWE, DURHAM and RUSSON, JJ., concur.