REQUESTED BY: Senator Chris Beutler Nebraska State Legislature
You have requested our opinion regarding the constitutionality of LB 479, as amended by AM0852. LB 479, as amended, includes several changes to the Nebraska Ethanol Development Act, Neb. Rev. Stat. §§ 66-1330 to66-1348 (1996 and Cum. Supp. 2002) [the "Act"]. The Act provides for certain tax credits for ethanol produced at a qualifying ethanol production facility. Neb. Rev. Stat. § 66-1344 (Cum. Supp. 2002). Subsection (4)(a) of § 66-1344 provides that "[b]eginning January 1, 2002, any new ethanol facility which is in production at the minimum rate of one hundred thousand gallons annually for the production of ethanol, before denaturing, on or before June 30, 2004, shall receive a credit of eighteen cents per gallon of ethanol produced . . ." for specified periods. Neb. Rev. Stat. § 66-1444(4)(a).[1] "[N]ew ethanol facility" is defined to "mean an ethanol facility which (i) is not in production on or before September 1, 2001, or (ii) has not received credits prior to June 1, 1999." Neb. Rev. Stat. § 66-1344(4)(b) (Cum. Supp. 2002). In order to receive the credits provided in subsection (4) of § 66-1344, producers must enter into written agreements with the Tax Commissioner. Neb. Rev. Stat. § 66-1344.01 (Cum. Supp. 2002).
[1] The credits provided under subsection (4) of § 66-1344 were part of 2001 Neb. Laws, LB 536.
LB 479, as amended by AM0852, proposes to amend the definition of "new ethanol facility" as follows:
 [N]ew ethanol facility means a facility for the conversion of grain or other raw feedstock into ethanol and other byproducts of ethanol production which (i) is not in production on or before September 1, 2002, or (ii) has not received credits prior to June 1, 1999. A new ethanol facility does not mean an expansion of an existing ethanol plant that does not result in the physical construction of an entire ethanol processing facility or which shares or uses in a significant manner any existing plant's systems and does not include the expansion of production capacity after June 30, 2004, of a plant qualifying for credits under this subsection. This definition applies to contracts entered into before, on, or after the effective date of this act. (Emphasis added).
It is our understanding that a number of ethanol producers have entered into agreements with the Tax Commissioner pursuant to §66-1344.01 under which production of the 100,000 gallon minimum annual rate required by § 66-1344(4)(a) to qualify for credits will occur at a new ethanol facility prior to June 30, 2004, followed by expansion of the facility to a capacity of several million gallons.[2]
LB 479, as amended, would prohibit the receipt of credits for expansion of such facilities. As the amendment expressly provides that "[t]his definition applies to contracts entered into before . . ." the bill's effective date, you have asked us to address whether application of the amended definition of "new ethanol facility" to existing ethanol production agreements unconstitutionally impairs contractual obligations under these agreements.
 I. Does LB 479, as Amended, Change Existing Law?
Initially, prior to addressing any question regarding impairment of contracts, it is necessary to determine if the amended definition of "new ethanol facility" effects a change in the statutory definition of this term in § 66-1344(4)(b). It has been suggested that the amendment merely interprets or clarifies the Legislature's intent in defining "new ethanol facility" in a manner consistent with LB 536, and that retroactive application of the amended definition thus does not impermissibly impair any vested rights or contracts entered into between producers and the State. In this regard, it has been recognized that "[t]he mere fact that a statute has a retrospective application does not necessarily render it unconstitutional. For instance, a statute that merely clarifies, rather than changes, existing law does not operate retrospectively even if it is applied to transactions predating its enactment." 16B Am. Jur.2d Constitutional Law § 690 (1998) (footnotes omitted). Thus, it is first necessary to examine whether the amended definition of "new ethanol facility" effects a change in the law under which existing agreements were entered.
Subsection (4)(a) of § 66-1344 provides that "[b]eginning January 1, 2002, any new ethanol facility which is in production at the minimum rate of one hundred thousand gallons annually for the production of ethanol, before denaturing, on or before June 30, 2004, shall receive a credit of eighteen cents per gallon of ethanol produced . . ." for specified periods. Neb. Rev. Stat. § 66-1444(4)(a). "[N]ew ethanol facility" is defined to "mean an ethanol facility which (i) is not in production on or before September 1, 2001, or (ii) has not received credits prior to June 1, 1999." Neb. Rev. Stat. § 66-1344(4)(b) (Cum. Supp. 2002). Thus, the only current statutory requirements to qualify a "new ethanol facility" for credits are that the facility must be in production at a "minimum rate of one hundred thousand gallons of ethanol annually . . . on or before June 30, 2004 . . .," and that the facility either (1) was "not in production on or before September 1, 2001 . . .," or (2) had "not received credits prior to June 1, 1999." Neb. Rev. Stat. §§ 66-1344(a) and (b) (Cum. Supp. 2002).
In addition to the qualifications to receive ethanol credits under subsection (4) of § 66-1344, Neb. Rev. Stat. § 66-1344.01
requires that producers enter into agreements with the Tax Commissioner to receive credits. Section 66-1344.01 provides:
 The Tax Commissioner and the producer eligible to receive credits under subsection (4) of section 66-1344
shall enter into a written agreement. The producer shall agree to produce ethanol at the designated facility and any expansion thereof. The Tax Commissioner, on behalf of the State of Nebraska, shall agree to furnish the producer the tax credits as provided by and limited in section 66-1344 in effect on the date of the agreement. The agreement to produce ethanol in return for the credits shall be sufficient consideration, and the agreement shall be binding upon the state. No credit shall be given to any producer of ethanol which fails to produce ethanol in Nebraska in compliance with the agreement. The agreement shall include:
(1) The name of the producer;
(2) The address of the ethanol facility;
 (3) The date of the initial eligibility of the ethanol facility to receive such credits;
 (4) The name plate design capacity of the ethanol facility as of the date of its initial eligibility to receive such credits; and
 (5) The name plate design capacity which the facility is intended to have after the completion of any proposed expansion. If no expansion is contemplated at the time of the initial agreement, the agreement may be amended to include any proposed expansion.
Neb. Rev. Stat. § 66-1344.01 (Cum. Supp. 2002) (emphasis added).
"In reading a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense." First Data Corp. v . Nebraska Dep't of Revenue, 263 Neb. 344,352, 639 N.W.2d 898, 903 (2002). "A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless." Sydow v. City of Grand Island, 263 Neb. 389, 397, 539 N.W.2d 913, 921 (2002). "[A] court will construe statutes relating to the same subject matter together so as to maintain a consistent, harmonious, and sensible scheme." Premium Farms v. County of Holt, 263 Neb. 415, 427, 640 N.W.2d 633, 642 (2002).
The plain language of §§ 66-1344(4) and 66-1344.01, construed together, evidences an intent to allows producers entering into agreements to qualify for credits for a "new ethanol facility" provided: (1) the producers have met the 100,000 gallon annual rate production threshold by June 30, 2004; and (2) the facility either was not in production on or before September 1, 2001, or had not received credits prior to June 1, 1999. The statutes do not appear to limit a producer to credits based on production capacity achieved on or before June 30, 2004, if the minimum production level is achieved. The language of §66-1344.01 providing that the agreement encompasses production of ethanol "at the designated facility or any expansion thereof," and that an agreement may include reference to facility capacity "after the completion of any proposed expansion," appears to contemplate that producers are eligible to receive credits based on the expansion of a "new ethanol facility" pursuant to agreements entered into under existing statutes. Under this interpretation, retrospective application of the definition of "new ethanol facility" in LB 479, as amended, would effect a change in existing law altering the effect of a number of ethanol production agreements entered into between producers and the State.
Indeed, an examination of agreements entered into by producers and the Tax Commissioner providing for production at the minimum rate on or before June 30, 2004, and including expansion of the facility's name plate design capacity thereafter, demonstrates an administrative construction consistent with an interpretation allowing credits for expansion of capacity at facilities timely meeting the statutory minimum production deadline. The courts accord deference to the interpretation and application of statutes by administrative agencies or officers charged with their administration and enforcement. Metropolitan Utilities Dist. v. Balka, 252 Neb. 172, 560 N.W.2d 795 (1997); Vulcraft v. Karnes,229 Neb. 676, 428 N.W.2d 505 (1988); McCaul v. American Savings Co.,213 Neb. 841, 331 N.W.2d 795 (1983). This administrative interpretation, while not controlling, further supports concluding that the amended definition of "new ethanol facility" alters the law under which existing ethanol production agreements were executed.
The history of LB 536 provides some indication the Legislature intended that the credits available for a "new ethanol facility" would be available only for a new facility completed on or before June 30, 2004, and that credits for "expansion" of a facility after that date were not contemplated. The Introducer's Statement of Intent accompanying LB 536 stated "[t]he bill amends section 66-1344 to establish a renewed ethanol production incentive for new ethanol plants modeled after previous production incentives that have expired . . .," and that "[n]ew subsection (4) provides that newly constructed ethanol facilities shall be eligible for a credits [sic] of 20 cents per gallon of ethanol produced." Committee Records on LB 536, 97th Leg., 1st Sess., 1 (Introducer's Statement of Intent) (Feb. 2, 2001).[3] The bill's principal introducer testified that the June 30, 2004, deadline was intended to "narrow" the "window" for credit eligibility "so that revenue measures in the bill match the assumptions of new plant building foreseeable in the most immediate future." Id. at 17-18 (Statement of Sen. Dierks). A contrast was drawn between the proposed higher credit for new facilities, as opposed to the lower, 7 and ½ cents credit per gallon "for existing plant expansion." Id. at 18. The bill's introducer further testified that "LB 536 lower[ed] the minimum annual production to qualify from 2 million gallons to 100,000 gallons . . .," which was "intended to open the program to farm-scale ethanol production systems that can be built in conjunction with feeding operations." Id.
This history potentially bolsters interpreting the Act to provide credits for "new ethanol facilities" only to those constructed on or before June 30, 2004. This interpretation would be consistent with the stated intent to match the revenue measures intended to fund the credits with expectations regarding the number of new facilities which would qualify for the credits.[4] Also, it appears the 100,000 gallon minimum threshold to qualify for credits was designed to allow small scale farm producers to qualify for credits, as opposed to permitting proposed new operators of large scale commercial ethanol facilities an opportunity to qualify for credits by producing the minimum amount on or before June 30, 2004, and expanding to greater capacity after that date. Under this interpretation, the amended definition of "new ethanol facility" in LB 479 would not alter the law under which current agreements were executed.
There are two impediments to adopting this construction. First, while certain portions of the legislative history of LB 536 support this view, other aspects of the history seem to contradict this interpretation. For example, the bill's introducer described the new incentives as applying to "new facilities which begin production within the window established by the bill," and stated it was intended "that the new plants would need to be in production prior to June of 2004." Committee Records on LB 536, supra, at 17 (Statement of Sen. Dierks). These statements indicate that new facilities were required only to "begin production" or be "in production" at the minimum rate on or before June 30, 2004, in order to qualify for credits as a "new ethanol facility." Second, legislative history is only used to construe a statute which is "reasonably considered ambiguous." Sydow v. City of Grand Island, 263 Neb. at 397, 639 N.W.2d at 921. As noted previously, the plain language of §§ 66-1344(4) and 66-1344.01, construed together, appears to unambiguously demonstrate a legislative intent under existing law to require that, in order for a producer to qualify for credits as a "new ethanol facility," the minimum production level in § 66-1344(4)(a) must be met by June 30, 2004, and the facility either must not have been in production prior to September 1, 2001, or did not receive credits prior to June 1, 1999. Section 66-1344.01 provides that a producer entering into an agreement to receive credits at a "new ethanol facility" may agree to produce ethanol qualifying for credits "at the designated facility or any expansion thereof." Neb. Rev. Stat. § 66-1344.01
(Cum. Supp. 2002). Given this statutory language, it is difficult to assert that the definition of "new ethanol facility" in LB 479, as amended, does not change the definition of this term in the existing statutes under which various producers have entered into ethanol production agreements with the State, including credits based on expansion of qualifying facilities. Accordingly, the amended definition of "new ethanol facility" likely is not a mere legislative "clarification" or "interpretation" which does not alter the definition of this term under existing law.
 II. Does LB 479, as Amended, Unconstitutionally Impair Vested Rights or Existing Contracts?
If the amended definition of "new ethanol facility" is not viewed as a mere "clarification" or "interpretation" of present statutes, it is then necessary to address your question as to whether application of this new definition operates to unconstitutionally impair the obligation of contracts entered into by ethanol producers and the State under current law.
Article I, § 10, of the United States Constitution, provides that "[n]o state . . . shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ." The Nebraska Constitution similarly provides that "[n]o law impairing the obligation of contracts . . . shall be passed." Neb. Const. art. I, § 16.
In analyzing claims that legislation unconstitutionally impairs contractual rights, the issue is whether state law has "operated as a substantial impairment of a contractual relationship." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." General Motors Corp. v. Romein, 503 U.S. 181, 186
(1992). If the legislation involves a substantial impairment, "the State, in justification, must have a significant and legitimate public purpose behind the [law] . . ., such as remedying a broad or general social or economic" problem. Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411-12 (1983) (citation omitted). If a legitimate public purpose is established, it must be determined whether the law "[is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" Id. at 412 (quoting United States Trust Co. v. New Jersey,431 U.S. 1, 22 (1977)). While courts will generally defer to legislative judgments as to the necessity and reasonableness of acts affecting contractual relationships, Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 505 (1987), such deference is not appropriate where the State's financial self-interest is at stake. United States Trust Co. v. New Jersey, 431 U.S. at 25-26.[5]
The initial Contract Clause inquiry concerns whether a contractual relationship exists between producers and the State by virtue of agreements with the Tax Commissioner executed pursuant to §§ 66-1344(4) and 66-1344.01. Section 66-1344.01 specifically provides that the producer's "agreement to produce ethanol in return for the credits shall be sufficient consideration, and the agreement shall be binding upon the state." Neb. Rev. Stat. § 66-1344.01 (Cum. Supp. 2002). In reviewing the effect of this language, the following discussion from 16B Am. Jur.2d Constitutional Law § 723 (1998) is instructive:
In determining whether a particular statute gives rise to a contractual obligation subject to constitutional impairment, it is of first importance to examine the language of the statute. Absent an adequate expression of actual intent to create a contract, that which is undoubtedly a scheme of public regulation will not lightly be construed to be, in addition, a private contract to which the state is a party. Although it may be taken as a general rule that rights conferred by statutes or ordinances are presumed not to be contractual in their nature so as to prevent their alteration or abrogation, this presumption can be overcome if language in the statute and other indicia show that the legislature intended to bind itself contractually. A legislative enactment in the ordinary form of a statute may contain provisions which, when accepted as the basis of action by individuals or corporations, become contracts between them and the state within the protection of the clause of the Federal Constitution forbidding the impairment of contractual obligations; rights may accrue under a statute, or even be conferred by it, of such character as to be regarded as contractual, and such rights cannot be defeated by subsequent legislation or inadequate funding by the state.
Section 66-1344.01 expressly provides that agreements for credits under § 66-1344(4) are contracts between producers and the State. In prior opinions, we have recognized that agreements entered into under previous statutes allowing ethanol production credits based on agreements between producers and the State created contracts establishing vested rights. Op. Att'y Gen. No. 95043 (May 25, 1995); Op. Att'y Gen. No. 96031 (April 12, 1996). In each case, we concluded that the legislation in question was not intended to apply additional qualifications for credits to existing agreements, and, therefore, involved no unconstitutional retroactive application. Id. Implicit in these opinions was recognition that signed agreements already in effect under existing statutes created vested, contractual rights which could not be altered by the proposed amendatory legislation. Therefore, as to the first part of the Contract Clause analysis, the agreements between producers and the State entered into pursuant to §§ 66-1344(4) and 66-1344.01 constitute binding contracts subject to the Contract Clause.
The second aspect of the Contract Clause inquiry concerns whether the contractual impairment imposed by statute is substantial. Assuming the amended definition of "new ethanol facility" alters existing contractual rights, there appears to be little doubt that, if applied to existing agreements, it would effect a substantial impairment of certain contracts. In particular, producers that have entered into agreements to establish a new ethanol facility qualifying for credits based on meeting the minimum production rate of 100,000 gallons annually prior to June 30, 2004, and currently eligible to receive credits based on facility expansion after that date, would face a substantial impairment of their existing agreements under LB 479, as amended. The amendment would in effect nullify their ability to qualify for millions of dollars of credits which they are currently eligible to receive if they timely meet the current minimum 100,000 gallon production threshold and expand capacity after June 30, 2004, pursuant to agreements with the Tax Commissioner entered into under existing law. Producers entering into such agreements have undoubtedly made financial decisions and commitments in reliance on these agreements. It is difficult to envision how application of LB 479, as amended, to alter these agreements, cannot be viewed as a "substantial" impairment.
The third aspect of the Contract Clause analysis is whether a significant and legitimate public purpose justifies the impairment. The only seeming justification for the amendment is concern that the number of producers that have entered into agreements with the State under §§ 66-1344(4) and 66-1344.01 (including those that have agreed to meet only the minimum threshold by June 30, 2004, and to qualify for further credits based on facility expansion after that date) is greater than anticipated, and that this will result in the State incurring a substantially larger responsibility to provide a mechanism to fund credits under the Act than originally envisioned by the Legislature. Difficulty in finding legislative solutions to funding the State's obligations under existing contracts entered into under §§ 66-1344(4) and 66-1344.01 does not appear to be a significant, legitimate public purpose to justify altering existing agreements with producers and the State. This is particularly true where, as here, the contractual obligations involve the State's own financial self-interest.
 III. Conclusion
In sum, we conclude that LB 479, as amended, which alters the definition of a "new ethanol production facility" eligible for ethanol tax credits under § 66-1344(4) to prevent facilities meeting the minimum production rate on the date required under current law from qualifying for credits based on facility expansion after that date, likely creates an unconstitutional impairment of contracts between the State and producers that have been executed under existing law. Our conclusion is based on a finding that the proposed amendment does not appear to merely clarify or interpret existing law, but, in fact, attempts to retroactively change vested rights of producers that have entered into agreements with the State. The statute authorizing execution of these agreements specifically binds the State to provide such credits under the law in effect at the time of execution of the agreements. While an argument could be advanced to support concluding that the amendment merely clarifies or interprets the law under which the agreements were executed, limiting eligibility to receive credits to facilities completed and at full capacity as of June 30, 2004, without regard to subsequent expansion, we believe it is doubtful that a court would find that the amendment does not unconstitutionally impair vested, contractual rights.
Sincerely,
 JON BRUNING Attorney General
 L. Jay Bartel Assistant Attorney General
Approved:
_____________________________ Attorney General
pc: Patick O'Donnell Clerk of the Legislature
[2] A list of producers entering into agreements with the Tax Commissioner found on the Department of Revenue's web site indicates several agreements have been executed which provide for production at the 100,000 gallon annual rate threshold followed by an increase in plant capacity. See http://www.revenue.state.ne.us/fuels/eth_list.htm.
[3] The original bill was amended to reduce the amount of the credit for new facilities to 18 cents per gallon of ethanol produced. Neb. Rev. Stat. § 66-1344(4)(a) (Cum. Supp. 2002).
[4] During floor debate, it was noted that construction of only two new ethanol production plants was anticipated, and that the funding mechanism was designed based on this assumption. Floor Debate on LB 536, 97th Leg., 1st Sess., 8290 (May 24, 2001).
[5] The Nebraska Supreme Court follows essentially the same analysis to claims of contractual impairment under Neb . Const. art. I, § 16, as is applied to impairment of contract claims asserting violations of U.S. Const. art. I, § 10. See Pick v. Nelson, 247 Neb. 487, 528 N.W.2d 309
(1995).