ORDER AND OPINION
THOMPSON, Associate Justice.
ORDER
The opinion filed in these consolidated appeals on September 19, 2003 is vacated. It is replaced by the Amended Opinion filed today. With the filing of the Amended Opinion, the Court denies Appellees’ petition for rehearing.
OPINION
Respondent-Appellant Confederated Tribes'of.Grand Ronde appeals from the trial court’s orders reversing the decisions of the Enrollment Committee that denied the applications of Petitioners-Appellees (“the applicants”) for enrollment in the Tribe.[2] The trial court concluded that the Enrollment Committee acted arbitrarily and capriciously by applying the wrong-law in making its determinations. We exercise jurisdiction under Tribal Code § 310(h)(2) and reverse.
I. BACKGROUND
On July 27, 1999, the Tribe’s electorate approved an amendment to Article V of the Constitution of the Confederated Tribes of the Grand Ronde Community of Oregon (“enrollment amendment”), which alters and increases the requirements for membership in the Tribe. On September 14, 1999, the Secretary of the Interior approved the amendment and it became effective.[3]
At least twelve of the fourteen applicants submitted applications for enrollment in the Tribe prior to September 14, 1999.[4] After that date, in December 1999, *111 the Enrollment Committee considered all of the applications, applied the enrollment amendment to all of them, and denied enrollment in each instance on the ground that the applicant did not satisfy the new requirement of having a Tribal member parent at birth. The applicants requested reconsideration and, after the Committee upheld its initial decisions, then appealed to the trial court.
The trial court held that the Enrollment Committee had acted arbitrarily and capriciously in retroactively applying the enrollment amendment to the applicants. The court concluded that because the applicants had submitted their applications before September 14, 1999, the Committee should have applied the enrollment law in place prior to the enrollment amendment’s effective date. The court reversed the Committee’s decisions and remanded each case to the Committee for further proceedings under the enrollment law in effect before September 14, 1999, when the applicants submitted their applications. The Tribe now appeals the trial court’s decision to this Court.
II. STANDARD OF REVIEW
We review de novo the trial court’s orders reversing the Enrollment Committee’s decisions. See Tribal Code § 4.10(d)(4)(H) (2001) (providing for this Court’s de novo review of the Enrollment Committee’s decision). In this context, de novo review means that we view the case from the same position as the trial court. See Turtle Island Restoration Network v. National Marine Fisheries Service, 340 F.3d 969, 973 (9th Cir.2003) (“De novo review of a district court judgment concerning a decision of an administrative agency means the court views the ease from the same position as the district court.”) The seope of our review also is governed by § 4.10(d)(4)(H), which provides that the trial court and this Court may set aside an Enrollment Committee decision only if it “was arbitrary and capricious or a violation of Tribal Constitutional rights.”
III. DISCUSSION
A. The Retroactivity Analysis
In the trial court, the parties presented arguments on whether the Enrollment Committee had retroactively applied the enrollment amendment to the applicants, and, if so, whether that was permissible. In short, the issue was which enrollment law should the Committee have applied in considering the applicants’ enrollment applications—the one in effect before September 14, 1999 (Tribal Code § 4.10, as amended through September 17, 1997) or the one in effect in December 1999 when the Committee considered the applications (Tribal Code § 4.10, as amended November 3, 1999 to incorporate the more restrictive enrollment criteria contained in the enrollment amendment, which became effective September 14, 1999). Using the framework for retroactivity analysis set forth in Landgraf v. USI Film, Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the trial court analyzed the retroactivity issue and ruled that the Committee applied the wrong law to the applicants when it denied their applications based on the new, more restrictive enrollment criteria contained in the enrollment amendment. The court concluded that application of that criteria to *112 the applicants amounted to retroactive application of a new law, and that “it would be unfair to change the rules that apply to those applicants who submitted their applications before the effective date of the new amendment.” Duke v. Confederated Tribes of Grand Ronde, 3 Am. Tribal Law 77, 82-83, 2001 WL 36155289, *5, Order Remanding Enrollment Committee Determination 8 (2001).
In this Court, the Tribe, relying heavily on Landgraf argues that the Enrollment Committee’s application of the new enrollment criteria to the applicants did not constitute impermissible retroactive application of a new law. In Landgraf, the United States Supreme Court considered whether a federal statute “applied to cases that arose and went to trial before its enactment.” 511 U.S. at 257, 114 S.Ct. 1483, 128 L.Ed.2d 229. In doing so, it set out an analytical framework for determining the temporal reach of a newly enacted statute. We have carefully reviewed Land-graf and find the Court’s approach in that case to be well reasoned. Accordingly, we apply it here.
Before examining the statutory analysis set out in Landgraf, we note that there are no express prohibitions against retroactive laws in either the Grand Ronde Constitution or the Indian Civil Rights Act of 1968 (TCRA) (25 U.S.C. § 1301 et seq.). The ICRA, however, provides for due process rights that mirror the protections of the Due Process Clause of the United States Constitution. In Landgraf, the Court recognized that the “Due Process Clause * * * protects the interests in fair notice and repose that may be compromised by retroactive legislation.” 511 U.S. at 266, 114 S.Ct. 1483, 128 L.Ed.2d 229. Under Article III, Section 3(k) of the Grand Ronde Constitution, the “Tribal Council shall not * * * deprive any person of liberty or property without due process of law” and the “Tribe shall provide all persons within its jurisdiction the rights guaranteed by the [ICRAj.” Against that backdrop, we recognize that retroactive legislation may in some circumstances raise due process concerns. But because, as discussed below, we are able to resolve the issue presented in this appeal on statutory construction grounds, we do not reach the potential constitutional issue. See Standard. Oil Co. of California v. Arizona, 738 F.2d 1021, 1023 (9th Cir.1984) (“[W]e must, if at all possible, resolve cases on statutory grounds before reaching constitutional questions!.]”) (citing Escambia County, Florida v. McMillan, 466 U.S. 48, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984)).
In analyzing the statutory retroactivity question, the Landgraf Court made clear that the first step is to determine whether the statutory text or the legislative history manifests Congress’s intent concerning the statute’s temporal reach. Id. at 257-63, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229. Similarly, the first step in our analysis is to determine whether the text or history of the voter-approved enrollment amendment manifests the voters’ intent concerning application of the new enrollment criteria to enrollment applications submitted before the effective date of the amendment. With that first step in mind, and because the text of the enrollment amendment does not make clear whether it applies to enrollment applications filed before its effective date, we entered a Remand Order on September 25, 2002, shortly after hearing the parties’ oral arguments, because we had “determined that a supplemental factual record was required to resolve the legal issues presented” in these appeals. The cases were remanded to the trial court “for the limited purpose of conducting a fact-finding hearing addressing the following questions”:
*113 1. Who drafted, reviewed, and/or approved the following language contained in the “Explanation” section of the Sample Ballot for the July 27, 1999 election to amend Article V, Section 1 of the Grand Ronde Constitution (Appellees’ Supplemental Excerpts of Record 4)?
“If the proposed amendment passes, any application for tribal enrollment submitted after the approval date of the amendment will qualify for enrollment in the Grand Ronde Tribe if....”
2. When and to whom was the Sample Ballot distributed?
3. Beyond the foregoing statement in the Sample Ballot, was any other information concerning the proposed amendment to Article V, Section 1 of the Grand Ronde Constitution disseminated to tribal members by any tribal or governmental entity prior to the election— e.g., in the Official Ballot, official tribal letters to tribal members, oral announcements at official tribal meetings, announcements in the Smoke Signals or other tribal publications, and official announcements posted at tribal headquarters or elsewhere?
4. If information as described in the foregoing question was disseminated to tribal members, (a) what was the exact language of the disseminated information, (b) who drafted, reviewed, and/or approved the information, and (c) when, how, and by whom was the information disseminated?
The requested findings were necessary to complete the first step of Land-graf—that is, to determine whether the history of the enrollment amendment showed what the voters intended concerning the amendment’s application to enrollment applications pending as of the amendment’s effective date. If, for instance, the history made clear that the voters intended for the amendment to apply only to enrollment applications filed after the effective date of the amendment, the Enrollment Committee could not have properly applied the new enrollment criteria to the applicants—the voters’ contrary intent would control. The history of a constitutional provision adopted by the Tribe’s electorate includes sources of information other than the amendment itself that were available to the voters at the time they approved the provision, such as the ballot title, explanatory statements included with the ballot or contained in other materials, contemporaneous news reports, and editorial comment on the proposed amendment. See Ecumenical Ministries of Oregon v. Oregon State Lottery, 318 Or. 551, 559 n. 8, 871 P.2d 106, 111 n. 8 (1994) (identifying similar sources of information that the court examines “fi]n considering the history of a constitutional provision adopted through the initiative process”).
In response to our Remand Order, the trial court on March 13, 2003 entered and filed with this Court a Stipulated: Order incorporating the parties’ four-page stipulation and twenty-one document exhibits. The “Stipulation settles all issues related to the documents available for consideration by the [trial] [cjourt in review of’ these cases.[5] The Tribal Council participated in the process by approving a limited waiver of sovereign immunity purportedly to enable the trial court and this Court to consider the stipulation and document exhibits.[6]
We have reviewed the supplemented record and find only two items that warrant specific discussion—the Sample *114 Ballot and the Official Ballot—from which, the applicants contend, the voters’ intent concerning the temporal reach of the enrollment amendment can be determined. The Sample. Ballot and the Official Ballot contain the following explanation:
Explanation: This amendment will increase the requirements necessary to qualify as a Grand Ronde tribal member. Currently, an applicant must relinquish membership in another tribe and must show % or greater Indian blood quantum to be eligible for enrollment in the Grand Ronde Tribe. If the proposed amendment passes, any application for tribal enrollment submitted after the approval date of the amendment will qualify for enrollment in the Grand Ronde Tribe if the applicant has relinquished membership in another tribe for one year, can show ⅛ or greater Grand Ronde Blood quantum, and was born to a tribal member who was a tribal member at the time of the applicants [sic] birth at the time of the application, if not deceased.
Stipulated Order, Exhibits 14, 20 (emphasis added).
The foregoing “Explanation” is an integral part of both the Sample Ballot and the Official Ballot. Using common definitions for the key terms used in the “Explanation,” such as those offered by the applicants, “explain” means “to make plain or understandable” [7] and “submit” means “to present * * * to another for review, consideration, or decision, * * * to deliver formally.” [8] Based on those definitions, the applicants argue that both the Sample Ballot and the Official Ballot, through the “Explanation,” made clear to the voters “that the amendment applies only to applications submitted after the effective date of the amendment.” Aples.’ Ltd. Resp. Br. 1. Thus, the argument goes, the voters must have intended that the enrollment amendment would apply only to applications filed after September 14, 1999, the date the Secretary of the Interior approved the amendment and thus made it effective.
The flaw in that argument, however, is that the phrase “approval date of the amendment” in the “Explanation” is not susceptible to only the single interpretation offered by the applicants. Although that phrase is reasonably read to refer to the date the Secretary of the Interior approved the amendment, a voter could just as reasonably have read it to refer to the date the voters approved the amendment—that is, July 27, 1999, the date of the election. Indeed, the trial court itself used the word “approved” to describe what the voters did with the proposed amendment: “At the election, the amendment was approved by a considerable majority of the Tribal membership.” Duke, 3 Am. Tribal Law at 78-79, 2001 WL 36155289, at *1 (emphasis added). The word “approve” similarly was used in various materials provided the voters before the election. For example, in two separate pre-election, explanatory memorandums addressed to the voters, the Tribal Attorney wrote: “To pass [the amendment], at least 30% of the BIA registered voters must vote in the election and of those voting at least 2/3 must vote to approve the change.” [9] Identical language appeared in a pamphlet announcing the special election on the proposed amendment, in a slide presentation about the proposed amendment given at four pre-election Tribal Community Meet *115 ings, and in an article titled “BIA special election info” in a pre-election issue of Smoke Signals. [10] Although each of the foregoing also contained the following statement: “The constitutional amendment (if passed) is effective on the day it is approved by the BIA[,]” [11] the point is the word “approve” was not used exclusively to describe approval of the amendment by the BIA or the Secretary of the Interior.
In short, some (perhaps even a majority) of the voters who voted for the amendment may have understood the “Explanation” to say the amendment would apply to all applications filed after July 27, 1999, the date of the election. Others may have understood the “Explanation” to say the amendment would apply only to applications filed after its effective date, September 14, 1999. Had the “Explanation” referred to the “effective date” of the amendment, rather than the “approval date,” or had it said “the date the amendment is approved by the Secretary of the Interior,” that uncertainty would not exist. In light of the uncertainty, however, the words “approval date of the amendment” are ambiguous. We therefore cannot rely on the plain language of the “Explanation” to conclude, as the applicants contend we must, that the voters necessarily intended the enrollment amendment to apply only to applications filed after its effective date.
In reaching the foregoing conclusion, we reject the applicants’ argument—made in their petition for rehearing [12]—that given the context in which the words “approved” and “approval” appear in the Grand Ronde Constitution, the voters, who are presumed to know the content of the Constitution, could only have understood the phrase “approval date of the amendment” to mean the date the amendment was approved by the Secretary of the Interior. In support of that argument, the applicants note the following constitutional provisions:
Article VIII: “This Constitution, when adopted by a majority of the qualified voters!,] * * * shall be submitted for approval to the Secretary of the Interi- or, and shall become effective from the date of such approval” (Emphasis added.)
Article II, Section (l)(e): “There shall be a General Council, comprised of all duly enrolled members of the Confederated Tribes of the Grand Ronde Community of Oregon who are eighteen (18) years of age or older, which shall have the power to: * * * Amend this Constitution * *'*[;] I'pjrovided further, that amendments to this Constitution shall not become effective until approved by the Secretary of the Interior.” (Emphasis added.)
Article III, Section 1: Gives the Tribal Council the power to propose amendments to the Constitution and provides that “amendments to this Constitution shall not become effective until approved by the Secretary of the Interior.” (Emphasis added.)
They then argue that because the words “approved” and “approval” are used in the Constitution only to describe the Secretary of the Interior’s action in making a constitutional amendment effective, “[e]v-eiy tribal member who ever read the Grand Ronde Constitution could have: no other interpretation of the phrase ‘approval date of the amendment’ than that set out expressly in the [foregoing constitutional provisions]: the approval date can only be the date the amendment is approved by the Secretary of the Interiorf.]” *116 Pet. for Rhrg. 5. Although that argument has some initial appeal, it ultimately fails when considered in light of all the sources of information concerning the amendment the voters had available to them before the election.
The applicants correctly argue that we must presume the voters were aware of the foregoing constitutional provisions containing the words “approved” and “approval” in connection with the Secretary of the Interior when they reviewed the “Explanation” and its phrase “approval date of the amendment” in the Sample Ballot and the Official Ballot. See, e.g., In re Lance W., 37 Cal.3d 873, 210 Cal.Rptr. 631, 694 P.2d 744, 755 n. 11 (1985) (voters presumed to be aware of existing law). Even assuming that awareness, however, we are not convinced the voters necessarily would have understood the phrase “approval date of the amendment”—a phrase which does not appear anywhere in the Constitution—to mean approval by the Secretary of the Interior, as opposed to approval by the voters. A voter presumed to be aware of the content of the Constitution also must be presumed to be aware of the explanatory materials presented to the voters before the election, which, as previously noted, used the word “approve” in reference to both voter approval of the amendment and the Secretary’s post-election approval of the amendment. It is against that backdrop that we must determine how the reasonable voter would have interpreted the phrase “approval date of the amendment.”
The “Explanation” does not make clear that “approval date of the amendment” is tied to the Secretary’s approval, rather than the voters’ approval. Indeed, the phrase is in the same sentence as, and in a clause immediately following, the words “[i]f the proposed amendment passes”—a juxtaposition which could lead even the most careful reader to believe “approval date” refers to the date “the proposed amendment passes.” That is especially so given that no reference to the Secretary of the Interior or the BIA appears anywhere in the “Explanation.” That lack of clarity, coupled with the indiscriminate use of the word “approve” to refer to both the voters’ and the Secretary’s (or the BIA’s) approval of the amendment in various pre-election materials provided the voters, causes us to reject the applicants’ contention that the voters necessarily would have concluded the word “approval” was being used in the “Explanation” as it is used in the constitutional provisions relating to the Secretary’s approval of a constitutional amendment. Consequently, considering all of the pre-election sources of information available to the voters, we cannot say with confidence that based on the language of the “Explanation,” the voters clearly intended the amendment to apply only to enrollment applications filed after the amendment’s effective date (viz., the date the Secretary of the Interior approved the amendment). In sum, on this record, we simply are unable to determine what the voters’ intent was concerning the amendment’s temporal reach.
Because neither the text nor the history of the enrollment amendment manifests the voters’ intent concerning its temporal reach, we must proceed to the next level of retroactivity analysis set forth in Lavxlgraf, which incorporates a number of central concepts and principles. First, it has long been recognized that “ ‘[rjetroac-tive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions.’ ” Landgraf 511 U.S. at 265 n. 18, 114 S.Ct. 1483, 128 L.Ed.2d 229 (quoting General Motors Corp. v. Romein, 503 U.S. 181, 191, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992)). *117 Thus, in American jurisprudence, there is a deeply rooted presumption against retroactive legislation. “Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.” Id. at 265, 114 S.Ct. 1483, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229. For those reasons, we adopt the presumption against retroactive legislation as explained in Landgraf, understanding “legislation” to include not only the Tribal Council’s enactments but also voter-approved constitutional amendments.
Second, “[w]hile statutory retro-activity has long been disfavored, deciding when a statute [or constitutional amendment] operates ‘retroactively’ is not a simple or mechanical task.” Id., at 268, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229. There are, however, some functional conceptions of legislative “retroactivity” that provide guidance in performing that task. For instance, “[a] law is retrospective if it ‘changes the legal consequences of acts completed before its effective date.’ ” Miller v. Florida, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (quoting Weaver v. Graham, 450 U.S. 24, 31, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)). Further, a retroactive statute is one that “takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability.” Sturges v. Carter, 114 U.S. 511, 519, 5 S.Ct. 1014, 29 L.Ed. 240 (1885). But
[a] statute does not operate “retrospectively” merely because it is applied in a case arising from conduct antedating the statute’s enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates “retroactively” comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between operation of the new rule and a relevant past event. Any test of retroac-tivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity.
Landgraf, 511 U.S. at 269-70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (citation omitted).
In sum, when neither the text nor the history of a new law contains a clear expression of the law’s proper reach, a court must resort to judicial default rules, which, because they are grounded in a presumption against retroactive application of a new law, require a court to “determine whether the new [law] would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party’s liability for past conduct, or impose new duties with respect to transactions already completed.” Id. at 280, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229. “If the [new law] would operate retroactively, [the] traditional presumption teaches that it does not govern absent clear [legislative or voter] intent favoring such a result.” Id. Applying those standards to the instant case, we conclude that application of the new criteria contained in the enrollment amendment to the applicants did not have retroactive effect, because there was no impairment of a vested right, no increase in liability for the applicants, and no new duties imposed on the applicants.
Under the enrollment ordinance in place before the effective date of the enrollment amendment—that is, the ordinance in effect when the applicants submitted their applications, there were essentially four *118 steps in the application process. See Former Tribal Code § 4.10(d) (1997). To initiate the process, an. applicant was required to complete and submit to the enrollment staff an application form, which requested a variety of information relevant to determining eligibility for enrollment. Former § 4.10(d)(1). Supporting documents had to accompany the application. Former § 4.10(d)(2). The enrollment staff then would process each application and make a recommendation to the Enrollment Committee at its next regular meeting. Former § 4.10(d)(4)(A). If the application was complete and the Committee found that the applicant appeared to meet the requirements of the enrollment ordinance, the enrollment staff then prepared a written statement for the Tribal Council. Former § 4.10(d)(4)(B). In the final step, the Council either approved or rejected the application, taking into consideration any protest that may have been filed. Former § 4.10(d)(4)(F). It was not until'the Council approved the application that the enrollment staff had authority to enter the applicant’s name on the official tribal membership roll. Id.
It is clear, therefore, that a “vested right” to enrollment did not arise under the former enrollment ordinance until the Council had approved the application. None of the applicants had reached that step at the time the enrollment amendment became effective on September 14, 1999. Indeed, none had even reached the third step: consideration of the application by the Enrollment Committee. Thus, none had a vested right to enrollment when the new law took effect. In reaching that conclusion, we reject the applicants’ argument that a vested right to enrollment arose when their applications were filed. That argument depends entirely on a reading of former Article V of the Constitution (before it was amended in 1999) and former Tribal Code § 4.10(b)(1) and (4) (1997) with which we cannot agree.[13]
The applicants contend that the plain language of those pre-enrollment amendment provisions made clear they had a vested right to enrollment at the point their applications were filed. Former Article V provided that the membership of the Tribe “shall consist of all persons who are not enrolled as members of another recognized tribe, band or community and * * * [who have the requisite blood quantum and ancestry], have filed an application for enrollment according to procedures established pursuant to Section 3 of this Article, and have been accepted as members in accordance with the tribal ordinance adopted under Section 3 of th is Article. ” (Emphasis added). Former § 4.10(b)(1)(B) similarly stated that the membership of the Tribe “shall be open to all persons not enrolled as members of another federally recognized Indian tribe, band, or community and * * * [who have the requisite blood quantum and ancestry], have filed an application in accordance with the provisions of this ordinance and are accepted as members by the Tribe.” (Emphasis added). And former § 4.10(b)(4) stated that “[t]o be accepted as a member by the Tribe, the applicant must demonstrate close social and economic ties to the Tribe and must for one year have fully and unconditionally relinquished membership in any other Indian Tribe.” Former § 4.10(b)(4), the ap- *119 plieants argue, is an “express definition” of the phrase “accepted as members by the Tribe,” as used in former § 4.10(b)(1)(B). Aples.’ Br. 15. Building on that proposition, they then argue that the mere filing of an application for enrollment with proof of the requisite blood quantum, ancestry, and the requisite close social and economic ties to the Tribe gave rise to a vested right to enrollment under the criteria contained in the former enrollment ordinance. According to the applicants, after an application was filed, the Enrollment Committee and the Tribal Council performed only “ministerial” functions in the approval process. We disagree for the following reasons.
First, contrary to the applicants’ view, former § 4.10(b)(4) does not contain an “express definition” of the phrase “accepted as members by the Tribe.” Had the Tribal Council intended to expressly define that phrase,[14] it surely would have set the phrase off with quotation marks. Without that punctuation, former § 4.10(b)(4) is most reasonably read as doing nothing more than setting out the one requirement in addition to blood quantum and ancestry (viz., “close social and economic ties to the Tribe”) an applicant must satisfy in order to be accepted as a member by the Tribal Council under the multi-step enrollment procedure provided for under former § 4.10(d).
Second, the applicants’ proposed construction of former § 4.10(b)(4) effectively renders other sections of the same ordinance—namely, those sections providing for consideration of enrollment applications by the Enrollment Committee and the Tribal Council (former §§ 4.10(d)(4)(B) & (F))—meaningless or superfluous. The plain language of those sections makes clear that both of those bodies were to play a major role in deciding whether an application for enrollment was approved. Indeed, under the former law, the Tribal Council had the final authority to approve or reject an application, with substantial discretion to assess, for example, whether an applicant has “demonstratefd] close social and economic ties to the Tribe.” Former § 4.10(b)(4).[15] An applicant therefore had no vested right to enrollment until the Council approved the application. To adopt the- applicants’ proposed interpretation of the former ordinance, which essentially places with the enrollment staff the primary authority to approve the application, we would have to ignore the accepted canons of statutory construction that a court “must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.” Boise Cascade Corp. v. U.S. E.P.A., 942 F.2d 1427, 1442 (9th Cir.1991) (citing Sutherland Stat. Const. §§ 46.05, 46.06 (4th ed.1984)). See also Beck v. Prupis, 529 U.S. 494, 506, 120 S.Ct. 1608, 146 L.Ed,2d 561 (2000) (recognizing the longstanding canon of statutory construction *120 that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous). Accordingly, we reject that interpretation.
In sum, there is no merit to the applicants’ contention that when the Enrollment Committee considered and rejected their enrollment applications in December 1999, after the effective date of the enrollment amendment, they already had a vested right to enrollment under the former law. The filing of their applications created no such vested right. See, e.g., Pine Tree Medical Associates v. Secretary of Health and Human Services, 127 F.3d 118, 121-22 (1st Cir.1997) (no retroactivity concerns triggered by Secretary’s application of new guidelines to be considered in medieally-underserved-population (MUP) designations, even though provider’s application for MUP designation was submitted before issuance of those guidelines; no support for “the proposition that filing an application with an agency essentially fixes an entitlement to the application of those substantive regulations in force on the filing date”); Chadmoore Communications, Inc. v. Federal Communications Comm., 113 F.3d 235, 241 (D.C.Cir. 1.997) (no right vested on the filing of application with FCC); Hispanic Info. & Telecomms. Network v. FCC, 865 F.2d 1289, 1294-95 (D.C.Cir.1989) (“The filing of an application creates no vested right to a hearing; if the substantive standards change so that the applicant is no longer qualified, the application may be dismissed.”). Because no vested right to enrollment under the former enrollment ordinance existed at the time the Enrollment Committee denied the applicants’ enrollment applications, we are not persuaded that the post-September 14, 1999 enrollment criteria were applied retroactively to the applicants.[16]
B. The Trial Court’s Ruling
Finally, we address the trial court’s retroactivity ruling, which was based on the conclusion that “it would be unfair to change the rules that apply to those applicants who submitted their applications before the effective date of the new amendment.” Although it is not entirely clear, it appears the court, in arriving at that conclusion, was guided primarily by two principles noted in Landgraf: (1) “[elementary considerations of fairness dictate that * * * settled expectations should not be lightly disrupted [by applying a new law to a process commenced prior to the enactment of the law],” 511 U.S. at 265, 114 S.Ct. 1483, 128 L.Ed.2d 229, and (2) the presumption against statutory retroactivity is not restricted to cases involving “vested rights,” id. at 275 n. 29, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Kd.2d 229. The court also drew a distinction between expectations regarding the permanency of constitutional law and those concerning nonconstitutional changes in the law, comparing, for example, an amendment to a constitutional provision with a change to an administrative rule: “[A]n administrative rule is not a constitutional provision; one reasonably expects the latter to be considerably more permanent and to have considerably more stature and *121 significance.” Duke, 3 Am. Tribal Law at 82-83, 2001 WL 36155289, at *5. The court appears to have relied heavily on that distinction in implicitly concluding that the applicants had a legitimate, settled expectation that the constitutionally-based enrollment criteria in effect at the time their enrollment applications were filed would apply wThen the Enrollment Committee considered those applications, even if that occurred after the enrollment amendment became effective.
We believe the trial court’s analysis is flawed in two critical respects. First, the course of retroactivity analysis does not depend on the nature of the law in issue. The analysis of whether a new law or regulation operates retroactively is the same regardless of whether the new law is a constitutional provision, a statute, an ordinance, or an administrative rale. Cf. Rosasco v. Commission on Judicial Performance, 82 Cal.App.4th 315, 82 Cal.App.4th 1041A, 98 Cal.Rptr.2d 111, 116 (2000) (the general “principle [that] * * * legislative enactments are generally presumed to operate prospectively and not retroactively unless the Legislature expresses a different intention * * * is equally applicable to any kind of change in the law.”). Thus, in determining that the new enrollment criteria had been retroactively applied to the applicants, in a manifestly prejudicial way, the court incorrectly emphasized the fact that the change in law was of constitutional magnitude.
Second, insofar as the trial court concluded that the applicants had a settled expectation that the enrollment criteria in effect at the time their applications were filed would control when the Enrollment Committee acted, even if that were after the effective date of the enrollment amendment, that conclusion was incorrect. Thirteen of the fourteen applicants filed their applications with the Tribe after the voters had approved the enrollment amendment. At that point, whether those applications would be considered under the pre-amendment law or the new law was at best an open question. The same can be said for the one applicant who filed her application one day before the election. The trial court acknowledged that “the question may be a somewhat close one and * * * not free from all doubt.” Duke, 3 Am. Tribal Law at 82-83, 2001 WL 36155289, at *5. At bottom, when the applicants filed for enrollment they did so knowing that a significant change in the enrollment criteria either may have been on the horizon or may already have been approved by the voters. With that knowledge, the applicants simply could not have been certain their applications would be evaluated under the pre-amendment law. It would not have been reasonable for any one of them to believe such certainty existed. The applicants, therefore, can claim neither a settled expectation that the prior law would apply to their applications nor any unfairness in the Enrollment Committee’s reliance on the new law. At most, they are the victims of the timing of their enrollment applications, over which they had ultimate control.
IV. CONCLUSION
For the foregoing reasons, we hold that the Enrollment Committee did not retroactively apply the enrollment amendment to the applicants, and, therefore, its rejection of their enrollment applications was not arbitrary and capricious. Accordingly, we affirm., the. Committee’s action. The trial court’s contrary orders remanding the applicants’ cases to the Committee are RE *122 VERSED. [17]
I CONCUR: ROBERT J. MILLER, Chief Justice.

. The Tribe's thirteen separate appeals of the trial court’s orders in the fourteen applicants’ cases have been consolidated.

. Under Article II, Section 1(e) of the Grand Ronde Constitution, a constitutional amendment “shall not become effective until approved by the Secretary of the Interior.” The Secretary approved the enrollment amendment on September 14, 1999 through a written statement of approval issued by the regional director of the Bureau of Indian Affairs. Although there may be a question as to whether under 25 U.S.C. § 476(d)(2) the Secretary’s approval would have been considered given several days before September 14, 1999 (thus making for a slightly earlier effective date for the enrollment amendment), resolution of that issue is not critical to our decision. We therefore will assume, without deciding, that September 14, 1999 was the effective date for the enrollment amendment.

.It is undisputed that all the applicants except Shvla Jeffers submitted their enrollment applications to the Tribe after the July 27, 1999 election in which the voters approved the enrollment amendment. Shvla Jeffers submitted her application one day before the election. There is a factual dispute, however, between the Tribe and Katie Ballini and James Jeffers as to whether those applicants *111 submitted their enrollment applications before or after September 14, 1999. The trial court remanded those cases to the Enrollment Committee for further proceedings to resolve that issue. For purposes of our decision, we will assume those two applicants submitted their applications before September 14, 1999, just like the other twelve. Accordingly, hereafter all references to “the applicants” include Katie Ballini and James Jeffers.

. Stipulation, p. 4.

. Tribal Council Resolution No. 052-4)3

. Webster’s Ninth New College Dictionary 437 (1986).

. Id. at 1175.

.Stipulated Order, Exhibit 3, p. 3, Exhibit 4, p. 4, Exhibit 10, p. 3, Exhibit 11, p. 8, Exhibit 12, p. 2.

. Stipulated Order, Exhibit 6, p. 4.

. Id. (emphasis added)

.The Court appreciates the applicants’ thoughtful petition for rehearing and the helpful response filed by the Tribe.

. The applicants present this argument for the first time on appeal to this Court. Because we may affirm the trial court's decision on any proper ground, even if the trial court did not consider that ground or relied on different grounds or reasoning, we address the appli-earas' argument. See Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1294 (9th Cir.1998) ("If support exists in the record, the dismissal may be affirmed on any proper ground, even if the district court did not reach the issue or relied on different grounds or reasoning.”).

. Former § 4.10(b)(4) actually contains the phrase “[t)o be accepted as a member of the Tribe.”

. The applicants argue that whether an applicant had demonstrated “close social and economic ties to the Tribe” under fomtet §4.10 involved only “a simple factual determination of whether the applicant’s tribal member parent voted in the last tribal election before the application for enrollment was filed.” Aples.' Br.: 15-16 (citing former 4.10(dl(4)(A) & (B)). In making that argument, however, they overlook that former § 4.10(d)(4) did not limit the “close social and economic ties" assessment to the matters set forth in subsections (A) and (B), as is apparent: from the phrase that introduced those subsections: "Close social and economic ties may be demonstrated by: * **."■ Former § 4.10(d)(4) (emphasis added).

. The applicants only argue in passing that the Enrollment Committee’s application of the new criteria also "increase[cl] [their) liability for past conduct, [and] imposefd] new duties with respect to transactions already completed.” Landgraf, 511 U.S. at 280, 114 S.Ct. 1483, 128 L.Ed.2d 229, Their arguments on those points are essentially extensions of their “vested right to enrollment” argument. Iri any event, application of the new enrollment criteria did not attach increased liability for any of the applicants’ past conduct or affect a completed transaction (the mere filing of an application not constituting completion of the enrollment process).

. We do not reach the applicants' alternative argument that their parents actually were "members" of the Tribe when the applicants were born. Aples.' Br. 33-37. That issue was not presented to the Enrollment Committee and was not decided by the trial court. Because the issue involves unresolved factual questions, it is not properly before us. We express no opinion on whether the applicants may still present the issue to the Enrollment Committee.